Whitaker, Judge,
delivered the opinion of the court:
On November 16, 1956, plaintiff was discharged by the Civil Aeronautics Administration, which was then a part of the Department of Commerce. He sues, praying for resto *376 ration to Ms position and for tbe salary of which he has been deprived. The case is before us on defendant’s motion for summary judgment.
For some twenty-odd years prior to May 9,1954, plaintiff had been an employee of the Government, for a part of the time, at least, in the Civil Aeronautics Administration, Department of Commerce, with competitive civil service status. On that date he was transferred to an excepted position as chief of the Civil Aviation Mission, with headquarters in Santiago, Chile.
On October 5, 1956, after an investigation made by the ICA, United States Operations Mission, an agency of the State Department, charges were preferred against plaintiff by the CAA as follows:
1. That he did not perform his duties in accordance with a Memorandum of Agreement between the CAA and the Foreign Operations Administration, called FOA (later the International Cooperation Administration, called ICA), dated June 10,1956. (The ICA, United States Operations Mission, was a branch of the State Department. It had entered into an agreement with the CAA relative to carrying out overseas missions in which both the State Department and the Department of Commerce participated.)
2. That he had embarrassed the American Embassy by submitting to the Chilean Foreign Office directly, instead of through the ICA, a request to import a personal automobile duty-free;
3. That he had left an official car at his residence which was used by his family while he was absent from the Chilean mainland;
4. That he kept Government property at his residence;
5. That he attempted to have official purchases shipped through the Chilean Air Force instead of through established USOM (United States Operations Mission) channels.
Charge 1 was supplemented by five specifications as follows:
(a) When he made reports to the CAA in Washington, he did not send copies to the ICA, United States Operations Mission;
*377 (b) He contacted a Chilean associate in an attempt to import a personal car duty-free, instead of going through the ICA, United States Operations Mission;
(c) He requested additional technical personnel without going through the ICA, United States Operations Mission;
(d) He attempted to secure a Chilean license for the automobile he was using by applying directly to the Chilean Air Force, instead of going through the ICA, United States-Operations Mission;
(e) He loaned an automobile to the Chief of the Santiago Airport without securing the permission of the United States Operations Mission to do so.
Plaintiff was given five days, in which to answer the charges. On October 10,1956, he did so in detail.
First. He states that in the two years of his assignment at Santiago, Chile, he had received no complaints about his conduct or the performance of his duties, and that the charges were, therefore, wholly unexpected and came as a distinct shock.
Second. He denies that he failed to furnish to the ICA, United States Operations Mission, copies of his communications with the CAA on technical matters, and states that he had instructed his administrative assistant to always forward copies of such correspondence, although he admits this might not have been done in all instances, through unintentional oversight or clerical error.
Third. He says he consulted a Mr. Crews, a Chilean, who was assigned to his office as legal adviser, about the proper interpretation, of an executive order authorizing the importation of personal vehicles, but that he did not enlist his help in securing permission for such importation.
Fourth. He denies having requested additional technical assistance without prior clearance from the ICA, United States Operations Mission. He says he merely inquired as to the availability of such assistance, but made no request therefor.
Fifth. He admits having attempted to secure a Chilean license for the automobile he used for official purposes, this having been suggested to him by the liaison officer assigned to his office by the Chilean Director of Aeronautics. He says *378 he requested the registration, of the same in the name of the United States Operations Mission.
Sixth. He says he did assign a vehicle to the Air Traffic Control Specialist of the United States Operations Mission for use at the airport, and told him that when he had no personal use for it, it might be used for official purposes with his approval.
Seventh. He says that if his request to import a car duty-free caused any embarrassment to the United States Embassy at Chile, he was not aware of it, and for enlightenment in the matter he referred the personnel officer, to whom his letter was addressed, to the then Ambassador to Chile, and to the Counselor of the Embassy, and to two council attaches, and to the Air Force attache.
Eighth. He admitted leaving a Chevrolet carry-all at the garage at his home while he was on a trip to Easter Island, and he admits that his wife used it “on a few marketing trips,” since no other transportation was available.
He also answered the other two charges, but since they have been dropped, we do not set out his answers.
On October 24 he was advised by the personnel officer that his answers had been reviewed, and that “we have found them to be unsatisfactory with respect to all the charges,” which he sustained.
Plaintiff took an appeal to the Board of Grievance Review.
On November 28, 1956, the Board of Review rendered its opinion in which it is stated that:
An investigative report of the ICA, dated July 24,. 1956, was received through Security channels of the Department of Commerce alleging that Mr. Clark administered the project without regard to regulations of the United States Operations Mission and in violation of the agreement between the Department of Commerce and the Foreign Operations Administration [the predecessor of the ICA] and that his attempt to import a second personal car duty free embarrassed the American Embassy in its relations with the Chilean Foreign Office. The report further alleges various violations of Government regulations and general maladministration on the part of Mr. Clark.
A study of this report resulted in charges being made against Mr. Clark on October 5,1956. * * *
*379 Then on the second page of the opinion appears the following: “Following a review by members of the Board of the written material submitted in the case, the Board convened on November 14, 1956.” After which, the report goes on, Mr. Clark and his counsel were heard, and affidavits in Mr. Clark’s behalf were received. The implication is that “the written material” was considered in camera, and was not made available to the accused.
They sustained the first three charges, but held that the last two charges were unwarranted.
Thereafter, plaintiff appealed to the Secretary of Commerce, but the Director of Personnel refused to modify the findings of the Board of Grievance Review.
Except for the charge of the use of a Government-owned vehicle by his family, all the charges grow out of his lack of deference to the State Department. It was proper for this department to wish to be informed about all matters of consequence, but we must confess that to our minds, untutored in the ways of diplomacy, his derelictions in this respect appear to have been inconsequential. Copies of what correspondence he failed to furnish we do not know, but if they had been of moment, it would seem they would have said what they were. Why he should have had to take up with the State Department a request for permission to import duty-free a car for his personal use, we do not know; nor why he should have had to consult them about getting a Chilean license for the automobile he used on official business. The charges sustained appear to be frivolous; the other charges were dropped.
We seem to detect a certain amount of pique on the part of the State Department. They seem to have felt that it was only they who could talk to a foreign government, even in small matters. They had been ignored. They did not like it. They initiated the charges; they were based on the report of their investigator; and the CAA felt obliged to go along. This may turn out to be wrong, but it looks that way.
After plaintiff had exhausted his remedy in the CAA, he then took an appeal to the Civil Service Commission, but that Commission held that he was not entitled to the benefits *380 ■of section 14 of the Veterans Preference Act, and that he was not entitled to the protection of the Lloyd-La Follette Act, because he was discharged “while serving in an excepted position,” and they dismissed his appeal.
On February 4, 1957, plaintiff filed a request with the CAA for what he called his “reemployment rights granted CAA personnel on Mission assignment.” On February 12 the Acting Administrator of the CAA wrote him that, since he had been separated from the service for cause, he was not entitled to any restoration rights.
It is true that at the time of his removal plaintiff was in an excepted position, and the Civil Service Commission has jurisdiction to review removals only of persons in the classified civil service; but section 527 of the Mutual Security Act of 1954, 68 Stat. 832, 857, (section 1787 of Title 22, U.S.C.) provides that persons “performing functions under this Act outside the continental limits of the United States” “shall be entitled to the same benefits as are provided by section 528 of the Foreign Service Act * * *.” (Section 928 of Title 22, U.S.C.) Section 528 of the Foreign Service Act, 60 Stat. 999,1010, reads:
Upon the termination of the assignment of a Eeserve officer assigned from any Government agency, such person shall be entitled to reinstatement in the Government agency by which he is regularly employed in the same position he occupied at the time of assignment, or in a corresponding or higher position. Upon reinstatement he shall receive * * *.
Under this Act plaintiff retained certain rights in the competitive service, nothwithstanding his appointment to an excepted position. This right was the right of restoration to his position in the competitive service upon the termination of his assignment to the excepted position.
Plaintiff’s claim is grounded upon this Act of Congress giving him the right of restoration to his former position. Prosterman v. United States, 144 C. Cls. 692. If this right was jeopardized by his discharge from his excepted position, as the CAA held it was, this court has jurisdiction to inquire into the legality of his discharge.
*381 Ordinarily an employee in an excepted position bas no protection against discharge, whether it be for cause or at the whim or caprice of his superior, but where that discharge deprives him of his right to his old job under the classified civil service, granted him by an Act of Congress, it is effective only if it was for such cause as will promote the efficiency of the service. It cannot defeat his statutory right of restoration to his civil service position, if it was done arbitrarily or capriciously. One cannot be deprived of a right granted by Congress by the arbitrary act of his superior, whether that was the purpose of the arbitrary action or not.
Since this case is before us on a motion for summary judgment, we are not fully apprised of the facts, but we have the impression that the action of the Civil Aeronautics Administration in removing this employee was capricious. There are indications that the charges against him were of a trivial nature, inspired by what appears to have been nothing more than a meticulous insistence upon recognition of the State Department, represented in this instance by its agent, ICA, United States Operations Mission, as the sole and only one who could speak with a foreign government about even the smallest and most insignificant matter.
The only charge which appears to be of any substance is that plaintiff’s wife used an official automobile to do some marketing while plaintiff was away on official business beyond the continental limits of Chile. This was contrary, of course, to the law, but plaintiff’s personal automobile had been wrecked and he had been unable to secure permission to import another one for his own use. The official car was parked in plaintiff’s garage at his home, which apparently was all right; no other transportation was available; no one apparently was needing the car for official use, and it was standing idle. Under these circumstances, it does not seem to us to be so grave a crime, for his wife to have used it to go to the market, as to justify plaintiff’s dismissal from his position with the Government, which he had served faithfully and well for nearly a quarter of a century.
When the full facts are developed, it may turn out that plaintiff’s conduct was so reprehensible as to justify his dismissal, but there is enough indication of unreasonable, *382 capricious, and even arbitrary action to justify us in referring this case to a commissioner for the development of the full facts.
“There are in our civilization terrible hours. They are those mournful moments when society * * * pronounces shipwreck upon a human soul.” This man should not be discharged from the Government service, his name should not be blackened, his reputation ruined, without a full investigation of the facts alleged to warrant his discharge. The Civil Service Commission thought that it had no jurisdiction to inquire into the matter. We think we have.
Defendant’s motion for summary judgment will be overruled, and the matter will be referred to a commissioner for the taking of proof.
It is so ordered.
Laramore, Judge; Madden, Judge; and Jones, Chief Judge, concur.