Whitaker, Judge,
delivered the opinion of the court:
Plaintiff sues for the salary of which he alleges he has been deprived by reason of his unlawful discharge from his position in the Civil Aeronautics Administration, then a part of the Department of Commerce.
The case was before us heretofore on defendant’s motion for summary judgment. We held in an opinion reported in 145 Ct. Cl. 374, that, although plaintiff had been transferred from the classified civil service to an “excepted” position, i.e., one not protected by the Lloyd-LaFollette Act, 37 Stat. 555, as amended, 5 U.S.C. § 652, and Veterans’ Preference Act of 1944, 58 Stat. 387, as amended, 5 U.S.C. § 863, he, nevertheless, was entitled to restoration to his former or a corresponding or higher position in the classified civil service upon the termination of his assignment to the foreign service, and that since that restoration had been denied him because *479 he had been discharged for canse, he was entitled to maintain this snit. We remanded the case to a Commissioner for a report on the facts necessary for a determination of the question of whether plaintiff’s discharge was arbitrary or capricious, or was for a cause that will promote the efficiency of the service. The Commissioner has now reported, to. which exceptions have been taken by both sides, briefs have been filed, and oral argument has been heard.
For some twenty-odd years prior to May 9,1954, plaintiff had been an employee of the Government, for a part of the time, at least, in Civil Aeronautics Administration, Department of Commerce, with competitive civil service status. On that date he was transferred from his position as Chief of the Technical Assistance Division of the International Division of the Civil Aeronautics Administration, Grade GS-14, to an excepted position as Chief of the Civil Aviation Mission, with headquarters in Santiago, Chile.
On October 5, 1956, after an investigation made by the ICA,[1] United States Operations Mission, an agency of the State Department, in cooperation with the Civil Aeronautics Administration (hereinafter referred to as CAA), charges were preferred against plaintiff by the CAA substantially as follows:
1. That he did not perform his duties in accordance with a Memorandum of Agreement between the CAA and the Foreign Operations Administration, dated June 10, 1954. (The FOA had entered into an agreement with the CAA relative to carrying out overseas missions in which both the State Department and the Department of Commerce were to participate.)
2. That he had embarrassed the American Embassy and the USOM by submitting to the Chilean Foreign Office directly, instead of through the ICA, a request to import a personal automobile, duty-free.
3. That he had left an official car at his residence which was used by his family while he was absent on official business from the Chilean mainland for five or six weeks.
*480 4. That be kept Government property at bis residence.
5. That he attempted to have official purchases shipped through the Chilean Air Force instead of through established USOM channels.
Charge 1 was supplemented by five specifications as follows:
(a) When he made reports to the CAA in Washington, he did not at the same time send copies to the ICA, United States Operations Mission.
(b) He contacted a Chilean associate in an attempt to import a personal car duty-free, instead of going through the ICA, United States Operations Mission.
(c) He requested additional technical personnel without going through the ICA, United States Operations Mission.
(d) He attempted to secure a Chilean license for the automobile he was using by applying directly to the Chilean Air Force, instead of going through the ICA, United States Operations Mission.
(e) He loaned an automobile to the Chief of the Santiago Airport without securing the permission of the United States Operations Mission to do so.
Plaintiff was given five days in which to answer the charges. On October 10,1956, he did so in detail.
First. He states that in the two years of his assignment at Santiago, Chile, he had received no complaints about his conduct or the performance of his duties, and that the charges were, therefore, wholly unexpected and came as a distinct shock, especially in view of his faithful and efficient service with the Government for 23 years.
Second. He denies that he failed to furnish to the ICA, United States Operations Mission, copies of his communications with the CAA on technical matters, and states that he had instructed his administrative assistant to always forward copies of such correspondence, although he admits this might not have been done in all instances, through unintentional oversight or clerical error.
Third. He denied having attempted to import a second personal automobile duty-free through Señor Cruz, a Chilean associate. He said he tried to obtain permission of the American Embassy in Santiago to import a replacement for *481 the car he had brought with him to Chile, which had been damaged beyond repair. He said he did question Señor Cruz, who was assigned to his office as legal adviser, concerning an interpretation of an executive order of the Chilean Government authorizing the importation of personal vehicles, but that he had not undertaken through him to obtain permission of the Chilean Government for such importation.
Fourth. He denies having requested additional technical assistance without prior clearance from the I'CA, United States Operations Mission. He says he merely inquired as to the availability of such assistance as a preliminary to a possible request therefor, but that no such request was made.
Fifth. He admits having attempted to secure a Chilean license for the automobile he used for official purposes, this having been suggested to him by the liaison officer assigned to his office by the Chilean Director of Aeronautics, in order to facilitate the movement of the vehicle and to provide ready access to Government and military installations and facilities. He says he requested the registration of the same in the name of the United States Operations Mission.
Sixth. He says he did assign a vehicle to the Air Traffic Control Specialist of the United States Operations Mission for use at the airport, and told him that when he had no use for it himself, he might allow it to be used by others for official purposes.
Seventh. He says that if his request to import a car, duty-free, caused any embarrassment to the United States Embassy at Chile, he was not aware of it, and for enlightenment in the matter he referred the Personnel Officer, to whom his letter was addressed, to the then Ambassador to Chile, and to the Counselor of the Embassy, and to two council attaches, and to the Air Force attache.
Eighth. He denies ever having used a Government vehicle for other than Government purposes. He admitted leaving a Chevrolet carry-all at the garage at his home while he was on an official trip to Easter Island, and he admits that his wife used it “on a few marketing trips,” since no other transportation was available.
*482 He also answered the other two charges, but since they have been dropped, we do not set out his answers.
On October 24,1956, he was advised by the Personnel Officer that his answers had been reviewed, and that “we have found them to be unsatisfactory with respect to [all] the charges,” which he sustained.
• Plaintiff took an appeal to the Administrator of CAA, who referred it to the Board of Grievance Review.
The members of the Board first considered the written material in the case, including the report of the investigators, and then the Board was convened. Mr. Clark and his counsel were present and submitted affidavits and offered oral testimony, after which the Board found that the evidence fully supported charges 1, 2 and 8, but that “while charges Nos. 4 and 5 are true statements, they are not a valid basis for charges.”
The Administrator, after having withdrawn charges 4 and 5, approved the action of the Persomiel Officer. Accordingly, plaintiff was separated from the service, effective November 30,1956.
Plaintiff took an appeal to the Civil Service Commission, but this body refused to consider his appeal because he was then in an excepted position, and because he was not entitled to the benefit of section 14 of the Veterans’ Preference Act, supra. As we stated above, we held in an opinion on motion for summary judgment that the Civil Service Commission was in error in declining to consider Ms appeal, by reason of the provisions of section 528 of the Foreign Service Act of 1946, 60 Stat. 1010, 22 U.S.C. § 928 (1958) which provides for an employee’s reinstatement in the same position in the classified civil service which he had occupied at the time of his assignment to overseas service, or in a corresponding or higher position. The ground asserted by the Civil Service Commission for denying plaintiff’s appeal, that he had been discharged for cause, was valid only if that discharge was for the good of the service. To justify denial of the appeal on this ground, it was incumbent on the Civil Service Commission to consider whether or not his discharge was arbitrary or capricious or for a cause that will promote the efficiency of the service. Since the Civil Service Com *483 mission, erroneously refused to entertain bis appeal, we are compelled to do so.
Plaintiff was not quite as careful in observing tbe niceties of tbe Memorandum of Agreement between tbe Civil Aeronautics Administration and tbe Foreign Operations Administration as the latter body thought he ought to have been, but whatever may have been his omissions in this respect, they concerned matters that fall far short of providing a basis for the discharge of the offending employee.
Plaintiff says, in answer to the charge that he failed to furnish copies of his communications with the CAA in Washington at the same time that those communications were forwarded to Washington, that he instructed his administrative assistant and his typist to send such copies promptly, and he had assumed that they had done so, since no previous complaint had ever been made that this was not being done. It would appear, however, that copies were not always transmitted at the same time the originals were dispatched.
After plaintiff’s personal car, which he had taken with him to Chile, had been damaged beyond repair, he requested the Embassy in Santiago, who were in charge of such matters, for permission to import a replacement. His letter making this request was submitted to a clerk in the Embassy, who later advised him that the permission could not be granted. Why it was necessary for plaintiff to have consulted USOM, which was a branch of the State Department, and which could not have granted the permission, we do not know.
However, one charge was of a more serious nature. This was the charge of the private use of an official automobile. Plaintiff’s official duties required him to go to Easter Island and to take with him a surveying party. Plaintiff used a Government-owned automobile for the transportation of himself and the surveying party from Santiago to Valparaiso, some 50 to 100 miles away. After having made extensive surveys in the vicinity of Valparaiso, they left for Easter Island. On departure, plaintiff left the automobile, in which he and the surveying party had driven from Santiago, at his summer residence at Vina del Mar, just outside of Valparaiso, intending to use it for the return trip to Santiago. His trip to Easter Island consumed five or six weeks. While *484 be was gone, his wife used the car on a few occasions to do some marketing, and on another occasion to take a child to a medical dispensary.
The official charge against him on this account was that he used a Government vehicle for other than official purposes, in that he left it with his family at his summer residence during his absence while ,on official 'business at Easter Island, and in that it was used by his family for private purposes.
Our findings, based on the evidence adduced at the trial, are that this charge as drawn was an overstatement of the offense of which plaintiff was guilty. The personal use of the car was not extensive. Mrs. Clark did not use it freely as a substitute for the family’s personal car, but only on a few occasions. Plaintiff himself never used it for personal purposes. In extenuation of his wife’s use of it, we should bear in mind that the personal automobile plantiff brought with him to Chile had been damaged beyond repair and he had been denied permission to import a replacement for it. Had his personal car been available, Mrs. Clark presumably would not have used the official car. We do not condone Mrs. Clark’s use of a Government-owned automobile, but we do not think this infraction of the regulations was of so serious a nature as to warrant plaintiff’s discharge.
The misuse of a Government-owned automobile is the only offense of any real consequence. The others are relatively minor offenses, but, even so, if they were irritating to the Director of USOM, Chile, to an extent greater than he cared to bear, he was within his rights in asking that plaintiff be recalled; but they did not justify plaintiff’s discharge by the CAA. The charges which the agency thought so grave as to demand his discharge, in order to promote the efficiency of the service, they say, boil down to failure to consult with the USOM and keeping them advised of all his activities, even in small matters, and the limited use by his wife of the official car he had driven to Valparaiso, while he was absent on a trip to an offshore island on official business. Again we say, we do not condone these things, but we think they fall far short of affording a reasonable basis for plaintiff’s discharge. His discharge on these grounds was unduly harsh and unwarranted, and was an abuse of discretion by *485 the agency that demands redress by this court. Gadsden v. United States, 111 Ct. Cl. 487, 78 F. Supp. 126 (1948), 119 Ct. Cl. 86, 100 F. Supp. 455, cert. denied, 342 U.S. 856 (1951); Knotts v. United States, 128 Ct. Cl. 489, 121 F. Supp. 630 (1954) ; cf. Hoppe v. United States, 136 Ct. Cl. 559 (1956), cert. denied, 355 U.S. 816 (1957).
This would be so in any case, but it is particularly true in this case, in view of plaintiff’s good record with the Agency for nearly a quarter of a century. Since 1943 he had never been rated less than “very good”, and “excellent” on several occasions. Letters or memoranda from his superiors speak of him in high terms. "We do not think it amiss to quote excerpts from some of them.
In 1947 the then Chief of the Technical Division prepared a memorandum for plaintiff’s personnel file, in which he said:
* * * Mr. Clark has performed his assignments on this special detail with ability and conscientiousness. He has displayed initiative of a high degree in approaching his tasks most of which were new and had no precedent to follow. He has cooperated with others in a very admirable fashion and I feel he is to be commended for the work that he has done.
Also, in 1947, the Administrator of the International Legion wrote a memorandum to the Eegional Administrator, in which he said:
Mr. Clark was selected as Chief of the Mission by the Office of Foreign Operations on the basis of his past performance on both regular and special assignments of which it was cognizant. He is considered to have exercised very good judgment in coordinating the activities of the group and in maintaining relations with military and civilian personnel. It is believed that he demonstrated outstanding initiative and conscientiousness in performing his duties, in many instances under the most trying conditions. Therefore, I desire to commend Mr. Clark on his performance while assigned to this mission and express my appreciation to you for making him available for such assignments.
In 1949 this notation was made on his Efficiency Eating:
During the period of this rating, Mr. Clark in his capacity of Chief of the Civil Aviation Mission to Peru, *486 bas been faced with frequent situations of an extremely delicate nature. A complete change of Government occurred in Peru, the Peruvian National Airline, PIA, ceased operation, the President and the entire Board of Directors of the Peruvian Airport Corporation (COB-PAC), with whom the Mission largely worked, were replaced, and many other developments of major significance and effect on civil aviation took place. During periods of diplomatic strain the activities of the Civil Aviation Mission were particularly important. It was necessary for Mr. Clark to shift the emphasis of certain phases of the Mission’s work or to make other adjustments to meet the changing political situation. As a result of his sound judgment and ability to anticipate developments, the Mission has continued to function in a fully satisfactory manner and did not become involved in any undesirable situations. Mr. Clark’s efforts have resulted in the continuance of the Mission in a position of strong influence in Peru.
In 1952 the Administrator of the Civil Aeronautics agency wrote plaintiff as follows:
I have been informed by Mr. Thomas D. Johnson, Chief, Civil Aviation Division, Office of the United States High Commissioner for Germany, in letter dated July 16,1952, of the outstanding service you performed in assisting a group of German Aviation Specialists to make a tour of the United States to study United States Airports, Civil Aeronautics Administration installations and other aeronautical techniques.
I am greatly pleased to commend you, as did Mr. Johnson, for your excellent cooperation in making their tour such a great success and for your contribution in building a better International Civil Aviation relationship between the United States and Germany.
Since plaintiff’s discharge was the cause of the denial to Mm of the restoration to his former position or corresponding position in the classified civil service, his rights under the Foreign Service Act, supra, have been violated, and he has been unlawfully deprived of his salary.
Ordinarily we would award plaintiff a judgment for his loss of earnings from the date of his discharge to the date of judgment, but since plaintiff has been guilty of some infraction of the regulations, for one of which 5 U.S.C. § 78 requires suspension, without pay, for not less than 30 days, *487 we award him a judgment for tbe full amount of tbe salary of his GS-14 position in tbe classified civil service from November 30, 1956, tbe date of bis dismissal, to the date of judgment, less 90 days, and less also whatever amount plaintiff may have been able to earn in tbe interim.
Therefore, plaintiff is entitled to recover and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Rule 38(c) in accordance with this opinion.
FINDINGS OE FACT
The court, having considered the evidence, the report of Trial Commissioner W. Ney Evans, and the briefs and argument of counsel, makes findings of fact as follows:
1. (a) After more than 15 years of service with the Civil Aeronautics Administration (hereinafter CAA), plaintiff was discharged for cause.
(b) At the time of his discharge, plaintiff occupied an excepted position. As hereinafter noted in finding 4(a),,he had transferred to the excepted position from a position in the competitive classified civil service. In effecting the discharge, the CAA applied the procedures of the Veterans’ Preference Act, although plaintiff was not a veteran within the meaning of the act. The Civil Service Commission declined to review the agency action because plaintiff was not in fact a veteran and because the position from which he was removed was an excepted position;
(c) Plaintiff now sues to recover lost earnings, alleging that the action of the CAA was arbitrary and capricious.
2. (a) Plaintiff was initially employed by the CAA in November 1940 as an airway traffic controller. In 1947, he was detailed to Europe as Chief of the Mission, Airways Specialist. Shortly thereafter, he was transferred to the International Region (an administrative subdivision) of CAA and sent to Peru as Chief of the CAA Mission to that country. He remained in Peru until 1950, when he was reassigned to the Technical Assistance Division of CAA’s International Region, in Washington. He became Chief of this division in 1952, and continued in that position until May 1954, when he was assigned as Chief of the Civil Aviation Mission in Santiago, Chile. It was this position from which he was *488 recalled in July 1956. Although he was reassigned upon his return to Washington, he continued in the excepted position until his removal on November 30,1956.
(b)Table 1 lists plaintiff’s performance ratings for the years 1942 through 1950 (excepting 1944, which is not in evidence). The table shows that plaintiff’s performance during the 6-year period 1945 through 1950 was rated Very Good in four instances and Excellent in two. During those years he moved up from Grade CAF-9 to Grade GS-14.

(c) Table 2 reflects plaintiff’s performance ratings during the years 1951 through 1954,[1] when the former rating scores (Unsatisfactory, Good, Very Good, or Excellent) were replaced by the scores Unsatisfactory, Satisfactory, or Outstanding. Plaintiff’s rating in each of these years was Satisfactory. No rating element was marked Unsatisfactory. During the 4-year period, he was rated Satisfactory on 11 secondary and 9 primary elements and Outstanding on 5 secondary and 10 primary elements.
(d) Following are excerpts from letters of commendation in plaintiff’s personnel folder.
(1) January 8, 1947: Memorandum to Personnel File, signed by the Chief of the Technical Division:
* * * Mr. Clark has performed his assignments on this special detail with ability and conscientiousness. He has displayed initiative of a high degree in approaching his tasks most of which were new and had no precedent to follow. He has cooperated with others in a very admirable fashion and I feel he is to be commended for the work that he has done.

*489

(2) June 24, 1947: Memorandum from the Administrator, International Region, CAA, to the Regional Administrator, First Region:
As you know, Mr. George S. Clark of your Region was detailed to Europe as Chief of the Mission, Airway Specialists (air traffic control) during the first five months of 1947. The purpose of this mission was to cover all phases of air traffic control with a view toward improving the quality of operating personnel and the efficient operation of the U.S. Air Traffic Control System.
Mr. Clark was selected as Chief of the Mission by the Office of Foreign Operations on the basis of his past performance on both regular and special assignments of which it was cognizant. He is considered to have exercised very good judgment in coordinating the activities of the group and in maintaining relations with military and civilian personnel. It is believed that he demonstrated outstanding initiative and conscientiousness in performing his duties, in many instances under the most trying conditions. Therefore, I desire to commend Mr. Clark on his performance while assigned to this mission and express my appreciation to you for making him available for such assignments.
(3) July 23, 1949: Notation on Report of Efficiency Rating:
During the period of this rating, Mr. Clark in his capacity of Chief of the Civil Aviation Mission to Peru, *490 has been faced with frequent situations of an extremely delicate nature. A complete change of Government occurred in Peru, the Peruvian National Airline, PIA, ceased operation, the President and the entire Board of Directors of the Peruvian Airport Corporation (COR-PAC), with whom the Mission largely worked, were replaced, and many other developments of major significance and effect on civil.aviation took place. During periods of diplomatic strain the activities of the Civil Aviation Mission were particularly important. It was necessary for Mr. Clark to shift the emphasis of certain phases of the Mission’s work or to make other adjustments to meet the changing political situation. As a result of his sound judgment and ability to anticipate developments, the Mission has continued to f miction in a fully satisfactory manner and did not become involved in any undesirable situations. Mr. Clark’s efforts have resulted in the continuance of the Mission in a position of strong influence in Peru.
(4) June 4, 1951: Letter from the Administrator, International Region, CAA, to plaintiff:
The Secretary has asked me to present to you, in his behalf, the Service Pin awarded upon completion of ten years association with the Department of Commerce.
I am particularly pleased to make this presentation as it affords me the opportunity to express my personal appreciation for your loyalty and service to the International Region during the portion of this decade that you have been with our group. Congratulations on your past performance and continued success to you in the years ahead.
(5) August 11, 1952: Letter to plaintiff from the Administrator of Civil Aeronautics:
I have been informed by Mr. Thomas D. Johnson, Chief, Civil Aviation Division, Office of the United States High Commissioner for Germany, in letter dated July 16, 1952, of the outstanding service you performed in assisting a group of German Aviation Specialists to make a tour of the United States to study United States Airports, Civil Aeronautics Administration installations and other aeronautical techniques.
I am greatly pleased to commend you, as did Mr. Johnson, for your excellent cooperation in making their tour such a great success and for your contribution in *491 building a better International Civil Aviation relationship between the United States and Germany.
(e) During the 2-year period extending from June 1954, when plaintiff arrived in Santiago, to May 1956, when the series of reviews were begun which culminated in his recall and discharge, both the Director and the Deputy Director of the United States Operations Mission in Chile (hereinafter USOM-Chile) considered plaintiff to have done a good job as Chief of the Civil Aviation Mission in Chile.
(f) Following is the text of a letter datelined Santiago, July 30, 1956, addressed to the American Ambassador by the Directorate of Politics of the Chilean Department of Political Affairs:[2]
The Minister of National Defense acknowledged with deep regret the news on the Civil Aeronautics Administration’s decision to transfer the Chief of the Civil Aviation Mission, Mr. George S. Clark, back to his home country.
Mr. Clark undertook the difficult task to iniciate [sic] the Mission’s operations, and he carried it out with zeal, intelligence and success and was able to satisfactorily overcome all the difficulties which always arise in starting a new enterprise.
The Directorate of Aeronautics which operated in intimate relationship with Mr. Clark is also sorry to see him go since his personal attitude was always directed to complete programs and plans which are highly beneficial to the near future of Chilean aviation.
During the two years Mr. Clark has lived in this country he has proved his interest for Chile, not only while performing his official duties but also in his private life, for which reason he has won a warm affection from the people he has had any contact with. In his desire to know the exact needs of the nation, he has not hesitated to visit the country in its full length, not omitting its most distant boundaries. His recent visit to Easter Island and Punta Arenas are recalled with pleasure. He has therefore shown interest for the country to which he was assigned and that attitude is highly pleasing to our Government.
This Secretariate of State has been following with *492 great interest the Chief of the Civil Aviation Mission’s activities and regards his departure with sincere regret.
The Ministry of Foreign Affairs and the Ministry of National Defense, fully aware of the importance of Mr. Clark’s presence in the country for the operation and development of Civil Aviation activities, consider as their duty to inform Your Excellency on the above and together with these considerations request that you kindly pass this information to the authorities concerned so they may know the reason for this note. We also beg you to use your high influences to have Mr. Clark’s transfer order annuled, if such an action is possible. * * *
(g) Prior to October 5, 1956, when the letter of charges was delivered to him by the Personnel Officer of CAA, plaintiff had never received from an administrative superior a warning, an unsatisfactory performance rating, or a reprimand.
3. (a) In 1952 the CAA established a position known as “Chief, Civil Aviation Mission,” for use in various foreign countries as designated from time to time. The position was described in general terms as follows :
The incumbent serves as Chief of the Civil Aviation Mission assigned to a foreign government for the purpose of providing technical knowledge and skill to further the development of a country’s civil aviation, in recognition of the need for civil air transportation in achieving a balanced and integrated development of the economic resources and productive capacity of the country.
(b) Following is an excerpt from the job description:
The Chief of Mission receives broad policy and technical guidance and direction from the Chief of the Technical Assistance Division, International Region, Washington, D.C., and through that office can draw upon all CAA resources in the conduct and functioning of his Mission.
No manual of operation or standardized instructions outline the manner in which the work of the Mission shall be carried out, due to the varying conditions which exist in the foreign countries involved. With the exception of the guidance received from the local U.S. Embassy at the Mission location in matters affecting the relationship of the U.S., and the foreign government *493 concerned, the Chief of Mission receives no immediate supervision due to his location abroad and the nature of his assignment.
(c) On June 1, 1953, in connection with a broad reorganization of the executive branch for the conduct of foreign affairs, the President sent to the heads of all executive departments a communication defining “relationships which will govern executive branch officials in the conduct of our international relationships.” Following is an excerpt from this communication:
The Director of the Foreign Operations Administration should take full advantage of the advice and assistance available in other agencies. He should coordinate his operations with related operations in other agencies. At the same time, I expect the Director of the Foreign Operations Administration to maintain full control and direction over all foreign economic and technical assistance programs rather man turn this responsibility over to other agencies. We must have an integrated direction of technical assistance and other foreign assistance activities.
(d) On June 10, 1954, an agreement was made between the Secretary of Commerce and the Director of the Foreign Operations Administration (hereinafter FOA), a branch of the State Department, to implement the working arrangements between CAA[3] and FOA.[4] Following are excerpts from the agreement:
This agreement defines the application of the President’s policy to the relationships between the Department of Commerce (hereinafter referred to as the Department) and the Foreign Operations Administration (hereinafter referred to as FOA). Eeference to the Department includes the constituent Bureaus and agencies of the Department.
$ $ $ $ $
nx SPECIAL PROJECTS
A. General
Certain aspects of the FOA program may be best conducted on a contractual basis, with FOA requesting another federal or other public or private institution to *494 provide a specific service or to conduct a specific technical assistance project.
In the event FOA requests, and the Department agrees, that the Department provide a service or conduct a specific project, an agreement will be developed which will describe the services to be performed, the responsibilities of FOA and the Department, and the procedures for performance and payments under the agreement.
In carrying out responsibilities assumed under such agreements, the Department will utilize personnel on or to be placed on its own rolls, will exercise professional and technical judgment and authority, and will support these operations with professional and technical backstopping as required.
* * * * *
D. Responsibilities and Procedures
* # # * #
2. Overseas
(a) Relationships of Department personnel to the USOM. Although the Department will be responsible for the implementation of the project, Department personnel will be responsible to the Director of the United States Operations Mission (USOM) on program policy, development, and changes, and on administrative matters and with regard to personal conduct and public relations. FOA regulations on personal conduct will apply. Except as provided in subsection “C” hereof, however, the detailed technical and administrative direction of the operating activities of project personnel is the responsibility of the Department.
Department project personnel are responsible to the Director of the USOM with regard to all contacts with the participating country government. In general, however, Department specialists will be in continual direct contact with their counterparts in the local government.
(b) Gommwnications. Department personnel may send official communications directly to the Department on technical operating and personnel matters pertaining to a project. Copies of all such communications will be provided the USOM at the same time. Communications of the same nature from the Department in the U.S. may be sent directly to Department personnel in the field with copies to the USOM. All other official communications such as those dealing with program and policy matters shall be transmitted through regular FOA channels, using airgram or cable forms in afl but exceptional cases.
*495 (c) Progress Evaluation and Contract Adherence. The Department has responsibility for operations within the terms of the contract. The USOM is responsible for continuing evaluation, through observation and through reporting by the Department’s personnel, to insure that the terms of the agreement are being met.
If the Director of the USOM should determine that the terms of the agreement are either not being met or are being exceeded, or if he disagrees with changes in the project that may be proposed by the Department field party, he has responsibility for securing performance and resolving such differences. If this cannot be accomplished by discussion between the Director of the USOM and the Chief of the Department field party, the Director of the USOM may order that further operations be suspended until outstanding issues are resolved between FOA/W and the Department.
(e) Plaintiff, as Chief of the Technical Assistance Division, International Eegion, CAA, participated in the negotiation of this agreement.
(f) The Administrator of the International Eegion of CAA transmitted copies of the agreement to all chiefs of missions and groups, advising each recipient, including plaintiff, that:
* * * it is evident that there will be closer working relationships _ between the CAA activities and the USOM’s. Field personnel should be very careful not to violate any of the requirements as related to keeping the USOM informed of all their activities by submitting a copy of all their official communications to the USOM.
4. (a) Effective May 9, 1954, plaintiff, then in Grade GS-14 and Chief of the Technical Assistance Division of the International Eegion of CAA, was transferred from his position in the classified service to an excepted position as Chief of the Civil Aviation Mission in Santiago, Chile. His Notification of Personnel Action stated:
_ Occupancy of this position constitutes a special foreign assignment and upon satisfactory completion thereof the incumbent shall be entitled to restoration by his former service to his former position or such other position as may be determined in accordance with appropriate rules and regulations.
*496 The right of restoration was also provided by the personnel regulations of CAA.
(b) The position to which plaintiff was thus transferred was the same position as described in finding 3. There is no evidence that the job description of the position was expressly modified as a result of the President’s directive or the agreement between Commerce and FOA.
(c) Within the CAA the motivation for the transfer of plaintiff to the excepted position was induced (1) partly on merit because of his qualifications and previous experience; (2) partly by Ms desire for foreign service; and (3) partly by desire on the part of Ms colleagues and associates in the Washington office to place him in service elsewhere.[5]
(d) Within the FOA (USOM-Chile), clearance of plaintiff for acceptance in the excepted position was not obtained without question. The Director of USOM-Chile, the official responsible for such clearance and acceptance, made inquiry concerning plaintiff, who was unknown to him. Kesponses to such inquiry indicated a reputation among former associates in other foreign posts of plaintiff’s being somewhat of a “free-lancer” and not a good team man. The USOM Director placed great stress upon team play. He insisted, as a condition of clearance, that plaintiff be instructed in Ms duties in this regard, and specifically cautioned against persevering in “free-lancing.” [6] Plaintiff was so instructed and cautioned, before he left WasMngton and after Ms arrival in Santiago.
5. (a) Plaintiff reported for duty in Santiago in June 1954, to establish a Civil Aviation Mission as part of USOM-Chile. During the first year of duty Ms staff consisted of a secretary and an admimstrative assistant, both native CMleans. Thereafter (in June and July 1955), he was *497 joined by two American technicians: Mr. Francis X. Finnan, and Mr. Lawrence E. Clark.
(b) From the beginning of plaintiff’s tour of duty in Santiago, the Director of USOM-Chile noted his failure to observe channels. There were discussions between them on the subject, some of them unpleasant. Each time plaintiff professed to yield the point to the Director; and he never repeated an offense. He did, however, persist in his “freewheeling” methods. He failed to supply USOM with copies of his communications at the time the communications were dispatched. He sent communications (or copies thereof) directly to the Embassy, and made inquiries of and reports to the Embassy staff without going through USOM. He persisted in talking to Chileans about, and arousing their interest in and enthusiasm for, projects which had not been approved by USOM (and in one instance wherein the project had been specifically disapproved by the Director of USOM). He granted leave and travel authority to a member of his staff (Mr. Firman) to return to the United States (because of illness in his family) without notifying USOM; and he undertook to arrange for the recall and replacement of another member of his staff (Mr. Clark) without advising USOM of his action.
(c) All of the matters described in the preceding paragraph were known to the Director of USOM-Chile in June 1956 before he decided to ask for plaintiff’s recall. Standing alone, they did not induce the decision. Later, the Director learned of transactions, hereinafter related, which he considered to reflect abuses by plaintiff of the automobile privilege. The knowledge of those transactions triggered the Director’s decision to ask for plaintiff’s recall.
6. (a) The importation of American automobiles into Chile was rigidly controlled in the interest of protecting Chilean dollar balances. Such cars as were available commanded premium prices on the local market.[7]
(b) The privilege of importing cars, duty-free, was first extended only to the Embassy, for official use, and to members of the Embassy staff, for personal use. The extension of this *498 privilege to TJSOM, for official use, and to members of its staff, for personal use, was a matter of courtesy on the part of the Chilean Foreign Office. The privilege could be, and in case of abuse might be, withdrawn by the Foreign Office. Regulations required that any staff member taking a personal car into Chile should agree that he would not dispose of it for at least 2 years, unless he were transferred out of the country.
(c) The Embassy, in the interest of protecting its relations with the Foreign Office, retained control over all transactions pertaining to the importation of automobiles by American personnel or agencies. Cars imported for official use by USOM were allocated by the Embassy to USOM for assignment by it to the various technical assistance services.
7. (a) Plaintiff took with him to Santiago his personally owned automobile. Within a year it was damaged almost beyond repair by traffic mishaps. Plaintiff submitted a letter (to which he attached his repair bills) to the clerk (a Chilean woman) in the office of the American Embassy through whom all automobile imports were cleared, asking for permission to import a second car, duty-free, before the expiration of the 2-year time limit: The clerk reported back to him that permission would not be granted. Some weeks or months later plaintiff reclaimed the letter in order to use the repair bills in making out his income tax.
(b) Thereafter, plaintiff learned of a Chilean regulation under which his situation might have been deemed exceptional. The Chilean Government had assigned to plaintiff’s office a Chilean lawyer, Señor Jaime Cruz, to give legal advice on local law pertaining to civil aviation. Plaintiff gave to Señor Cruz the letter he had reclaimed from the Embassy and asked him for an interpretation of the regulation.
(c) Señor Cruz, instead of restricting himself to a critical, legal analysis of the regulation, took the letter and the regulation to the Chilean Foreign Office and applied for advice. Someone in the Foreign Office thereupon called the clerk in the American Embassy to inquire whether or not she was still in charge of the importation of automobiles by Americans.
(d) Although these events took place sometime late in 1955 or early in 1956, the Director of TJSOM-Chile did not learn *499 of them until June 1956, when he was informed of them in the course of the investigations of the Civil Aviation Party.[8]
(e) Plaintiff explained to the Director of USOM-Chile that he had never authorized Señor Cruz to take up the matter with the Chilean Foreign Office, and denied that he had attempted or intended to attempt circumvention of Embassy regulations in connection with the application. The Director of USOM-Chile evinced no interest in the explanation. Neither did the Personnel Officer of CAA, the Board of Grievance Review, nor the Administrator of Civil Aeronautics. Each accepted the fact that an approach had been made to the Foreign Office as reflecting plaintiff’s responsibility for the action.
8. (a) Public transportation facilities in Santiago were quite inadequate to the needs, official as well as personal, of American personnel stationed there. Initially, plaintiff devoted his personal automobile to official use. In time, he persuaded USOM to allocate three official cars to the Civil Aviation Party, upon the understanding (and agreement by Chile) that the expenses of operation and repair would be borne by the Chilean Government.
(b) The last car so allocated to Civil Aviation arrived in Santiago in April or May 1956. Instead of making application for license plates in advance of the car’s arrival through USOM and the Embassy, plaintiff endeavored to obtain plates for the car through Chilean aviation (military) authorities. His purpose was to obtain license plates with some official, military designation, in the interest of facilitating entry into Chilean military (aviation) areas. The effort proved unsuccessful, and application for license plates was then made through official (American) channels. Meanwhile, the car stood idle and inoperable for 2 or 3 weeks.
(c) The Director of USOM-Chile, the Personnel Officer of CAA, the Board of Grievance Review, and the Administrator of Civil Aeronautics accepted the fact that an approach had been made to Chilean authorities without recourse to stated channels as reflecting plaintiff’s intention to circumvent established channels.
*500 (d) Plaintiff assigned another of the official cars to the Air Traffic Control Specialist on bis staff (Mr. Finnan), with instructions that when the vehicle was not being used for his purposes, it could be used around the airport for other official purposes, provided such use had his approval. Plaintiff advised the Chief of the Airport of his action, thereby giving sanction to the use that was thereafter made of the car, namely, the transportation of Chilean officials and aviation students.
(e) When the Director of USOM-Chile learned of this incident, he disapproved of plaintiff’s action because of (1) the possibility that the Chileans might endeavor to use the incident as precedent for the loan of automobiles as a form of technical assistance and (2) the reaction to be anticipated from the Chileans if and when USOM felt it necessary to ask for the return of the car.
(f) One of the three cars allocated to the Civil Aviation Party by USOM was a carry-all. In January 1956, while preparing for a trip to Easter Island, sailing from Valparaiso, plaintiff took the surveying party which was to accompany him, with its equipment, in the carry-all for the trip from Santiago to Valparaiso. He and his party made extensive surveys in the vicinity of Valparaiso before they left for Easter Island. Upon their departure, he sent the car to his summer residence at Viña del Mar, just outside of Valparaiso. During his absence of 3 weeks, his wife used the car for a few marketing trips and on one occasion to take a child to the dispensary for medical attention.
(g) The episodes involving these three official cars were not brought to the attention of the Director of USOM-Chile until June 1956, when they were reported to him by the men who were investigating the Civil Aviation Party. The USOM Director based his decision to ask for the recall of plaintiff upon plaintiff’s action in leaving the carry-all at his summer residence while he went to Easter Island. The Director expressed himself as concerned, not so much with the limited personal use of the car by plaintiff’s family, as with plaintiff’s lack of consideration of official needs in so monopolizing the limited official transportation facilities.
*501 9. (a) In June 1955, Mr. Lawrence E. Clark (no relation to plaintiff) was assigned to the Civil Aviation Party as a technical assistant. During his 1 year in Santiago, Mr. Clark encountered a series of personal difficulties. After several months, plaintiff determined to obtain a replacement. Mr. Clark refused to cooperate. A contest ensued, culminating in an investigation and the recall of both men, followed in each instance by formal charges and disciplinary action.
(b) Following is a summary of the charges against Mr. Lawrence Clark as set forth in the letter of charges directed to him on October 3, 1956,[9] by the Personnel Officer of CAA.
There were two charges: (1) disregard for and violation of rules governing importation of automobiles by United States citizens; and (2) involvement in a series of disputes which were embarrassing to the United States Government activities in Santiago.
Two specifications in support of the first charge alleged that Mr. Clark had entered into an agreement with a Chilean importer for the importation, tax-free, under Mr. Clark’s exemption, of a 1956 DeSoto; that the Chilean paid for the car and Mr. Clark was to receive a 1952 DeSoto; that Mr. Clark signed a certification at the Embassy that the 1956 DeSoto would not be sold or otherwise given over to another for 2 years; and that within the 2 years, Mr. Clark entered into a further agreement with the Chilean to turn the car over to him on a lease basis.
Five specifications in support of the second charge alleged that Mr. Clark had been involved in disputes with landlords, servants, a furniture manufacturer, and a lawyer, with concomitant intervention by the police and recourse to the courts.
(c) During the investigation of the Civil Aviation Party in Santiago, Mr. Clark alleged that he had been induced by plaintiff to import the automobile and that plaintiff had suggested to him the method of financing and had put him in touch with the Chileans who were involved. The evi- *502 deuce does not establish the truth of these allegations.[10] It is to be inferred from the evidence, however, that the Director of USOM-Chile and the Personnel Officer of CAA believed the allegations to be true.
10. (a) USOM-Chile first learned of the difficulties of Mr. Lawrence Clark, and of the friction between him and plaintiff, in May 1956. The Director of USOM asked the Deputy Director to investigate. The Deputy did so, and recommended that investigators be called in from CAA and ICA.[11] The call was made.
(b) On June 11, 1956, following the preliminary investigation of the Civil Aviation Party by the Deputy Director of USOM-Chile, a communication was forwarded to ICA-Washington by the Director of USOM-Chile. On June 14, 1956, five officials of ICA and two officers of CAA met for the purpose of discussing the situation and arriving at a recommendation of action. Their decision was that investigators should be sent from Washington by both ICA and CAA. The evidence pertaining to this meeting indicates that their concern related to interagency relationships between ICA and CAA in Santiago rather than to any specific abuses of privileges by members of the Civil Aviation Party stationed there. The recommendation was made, in CAA, to the Administrator of the International Eegion by the Acting Chief of the Technical Assistance Division.
(c) After 3 days of joint investigation in Santiago by representatives of CAA and ICA, the ICA investigator made a preliminary report to the office of ICA-Washington concerning “Administrative Difficulty USOM-Chile and CAA Program.” The text of the report is set forth in finding 26.
(d) The investigators had arrived in Santiago and had conducted their joint investigation on June 19-21,1956. The investigator for CAA then left Santiago, while the ICA representative continued the investigation in Santiago through June 29, and in Lima, Peru, on July 2,7, and 9. Before the departure of the CAA representative, the Director of USOM had decided to ask for the recall of Mr. Lawrence *503 Clark. With respect to plaintiff, the Director withheld decision pending completion of the investigation. It was then his hope, however, that if nothing further of a serious nature were disclosed, it would be possible to retain plaintiff at least until he was due for home leave in December of that year.[12]
(e) As of the date of the departure of the CAA representative, the facts which the investigation had disclosed with respect to plaintiff were (1) that he had known of the difficulties (possibly involving serious misconduct) of Mr. Lawrence Clark and had failed to advise USOM; (2) that he had approved home leave and travel for one of his technicians, Mr. Finnan, without consulting or advising USOM; and (3) that Señor Cruz had made a direct contact with the Chilean Foreign Office in relation to the importation by plaintiff of a second car, and that the Foreign Office had in turn made inquiry of the Embassy concerning the matter.
(f) On June 27, 1956, the investigator for CAA[13] made a report to the Eegional Administrator, International Legion, CAA. The text of the report is set forth in finding 27.
11. (a) On June 29, 1956, the ICA investigator orally reported in detail the results of his investigation to the Director of USOM-Chile. The Director thereupon made his decision to have plaintiff recalled, but directed that the order of recall be so timed that plaintiff’s replacement would arrive prior to plaintiff’s notification of recall “in order to avoid any possible damage to USOM as a result of an interim period.” Arrangements were made accordingly.
(b) In deciding to ask for plaintiff’s recall, the Director of USOM-Chile considered the interest of CAA in his action. The possibility of this action had been his reason for requesting a CAA investigator to work with the representative of ICA. He gave no thought to the consequences of his action in terms of plaintiff’s standing with or relationship to CAA.
(c) Sometime in July, plaintiff’s replacement arrived in Santiago and took over the office after handing to plaintiff the following letter, bearing date of July 3, 1956:
*504 This is official notice that you are hereby relieved of your assignment and duties as Chief, Civilian Aviation Mission to Chile, immediately upon receipt of this letter. Mr. H. O. Frederick, Chief of the Eegional Assistance Group, has been designated to take over your official duties and assignment on temporary basis effective the same date you receive this letter.
This letter supersedes any and all previous correspondence pertaining to your assignment to Chile.
You are directed to depart Santiago as soon as practicable but in no event later than such time as will permit you to report to my office in Washington, D.C. by 9:00 A.M., August 16,1956, utilizing the enclosed change of headquarters travel order.
In performing travel under this order you personally are not authorized stopovers enroute.
FRANK C. Stone,
Regional Administrator,

International Region.

(d) Mr. Frank C. Stone, Regional Administrator, International Region, CAA, was the author of the appraisal report on plaintiff summarized in footnote 5 (finding 4). Five weeks after he signed the letter quoted in the preceding paragraph, he was called into the office of the Administrator of CAA and summarily relieved of his responsibilities as Ee-gional Administrator of the International Eegion. This action in relation to Mr. Stone had no connection with CAA disciplinary action in relation to plaintiff.
(e) On July 29,1956, in Lima, Peru, the ICA investigator prepared his final, written report and forwarded it to ICA and CAA, Washington. The text of his report is set forth in finding 28.
(f) Sometime during early August 1956, plaintiff returned to the United States.
12. (a) On August 16, 1956, the following memorandum was directed to plaintiff in the name of the Administrator, International Region, although the memorandum was signed by Mr. Evan J. Lewis, whose position at the time was Chief, Technical Assistance Division:[14]
*505 Pending review and disposition of your case by the Personnel Office, you are hereby temporarily assigned to the _ Training Branch of the Technical Assistance Division. You are to report to Mr. John Tevis for work assignment. As you know, training is one of the important functions of a Mission. A training-catalogue is needed, the preparation of which is a challenging project. Messrs. Tevis and Myers will give you guidance and ideas on the project.
Confirming our verbal conversation of this date, you will be authorized leave to arrange for your personal affairs and to obtain medical examinations as needed. All such leave should be arranged through Mr. Tevis.
(b) On September 14, 1956, the Personnel Officer, CAA, forwarded to the Acting Administrator, International Eegion, “our only copy” of the final report of the ICA investigator (set forth in full in finding 28) with the request that he submit “as soon as possible [his] recommendation as to the sanction which should be applied to this employee.” The forwarding memorandum listed “an outline and illustrative questions of the type of information” desired, and concluded with an urgent request for “priority handling in view of the nature of this matter.”
(c) On September 27, 1956, the Acting Eegional Administrator, International Eegion, returned the ICA investigator’s report, to the Personnel Officer with his comments and recommendations. The Acting Administrator at that time was Mr. Anthony T. Callanan, who had replaced Mr. Frank C. Stone a month or 6 weeks earlier. His comment opened with the statement:
* * * Because of the occupational area of the International Eegion and my own lack of familiarity with the details, I have prepared this reply with the assistance of Mr. Evan J. Lewis, Chief, Technical Assistance Division, and Mr. Edward W. Warner, Latin-America Area Supervisor.
Following is the closing paragraph of the 7-page report submitted by the Acting Eegional Administrator:
* * * As a result of my review and discussion of this matter, I would feel remiss in my duty as Acting Administrator of the International Eegion if I did not take appropriate steps to insure that this employee does not *506 again, bold a position of responsibility in the CAA. I therefore recommend the maximum appropriate disciplinary action.
(d) There is no evidence to indicate that Mr. Callanan, prior to the submission of the foregoing recommendation, had before him or sought to obtain any statement by plaintiff in explanation of the situation.
13. (a) The Personnel Officer had followed plaintiff’s situation from the time the first message was received from the Director of USOM-Chile. He had seen the preliminary reports of the investigators in Santiago. With the final report of the ICA investigator and the comment and recommendation of the Acting Regional Administrator before him, he decided to initiate procedures for “the maximum appropriate disciplinary action” and referred the matter to the legal division for preparation of the letter of charges.
(b) The Personnel Officer testified that his mind was not closed when he initiated the charges against plaintiff; that the preparation and lodging of the charges represented action based on probable cause; and that his final decision was not made until after he reviewed plaintiff’s reply to the charges.
(c) At some stage of the proceedings, the Personnel Officer conferred with the Acting Regional Administrator (Mr. Callahan), the former Regional Administrator (Mr. Stone), the Chief of the Technical Assistance Division (Mr. Lewis), and the sometime Acting Chief of the Technical Assistance Division (Mr. Earp).
14. Following is the text (in pertinent part) of the letter of charges directed to plaintiff on October 5, 1956, by the Personnel Officer of CAA:
* * * On the basis of the information developed during * * investigation, it is proposed to effect your discharge no sooner than thirty (30) calendar days from the date you receive this letter. This action is proposed for the following reasons:
1. You did not perform your duties in accordance with provisions of the Memorandum of Agreement between the Civil Aeronautics Administration, Department of Commerce and Foreign Operations Administration (predecessor of ICA), dated June 10, 1954, and transmitted to you on Jime 23. 1954. in that
*507 (a) When you reported directly on technical matters to the Civil Aeronautics Administration, Washington, you did not at the same time provide copies of such communications to the ICA United States Overseas Mission, Santiago, USOM[, as required by Section III, D.2. ib) of the said Memorandum of Agreement;
(b) You attempted initially to import a second personal car duty-free by contacting a Chilean associate, one Julio Cruz, instead of processing the matter through the Director of the United States Overseas Mission, DUSOM, in violation of Section III.D.2. (a) of the said Memorandum of Agreement;.
(c) You requested additional technical personnel without obtaining a prior clearance of such requests from the ICA USOM at Santiago, in violation of Section III.D.2. (a) of the said Memorandum of Agreement;
(d) You attempted initially to obtain a Chilean license for a Government vehicle through a Chilean Air Force channel instead of processing the request through DUSOM, in violation of Section III.D.2. (a) of the said Memorandum of Agreement;
(e) Without receiving permission from or consulting with the USOM, the agency having custody and responsibility for the vehicle, you loaned an official carryall to the Chief of the Santiago Airport, National Ministry of Defense, Aeronautics Division, Civil Aeronautics Mission, in violation of Section III.D.2.(a) of said Memorandum of Agreement..
2. You embarrassed the American Embassy and the United States Overseas Mission in its relations with the Chilean Foreign Office in that your intermediary, a Chilean National, tendered on your behalf directly to the Chilean Foreign Office a letter, requesting permission for you to import a second car duty-free, together with invoices purporting to show that your first car had been wrecked.
3. You used a Government vehicle for other than official purposes in that you left an official carry-all with your family at your summer residence at Vina del Mar during your 5 to 6 weeks absence from the Chilean mainland while on official business at Easter Island and the carry-all was thereby used by your family for private purposes.
4. You retained without permission in your personal residence Government property costing in excess of $3,-600 and itemized as follows:
*508 1 lens, Zeiss_ $198. 88
1 chair_ 16.42
1 desk_ 83.33
1 Oontax camera- 235. 00
1 Radio Station Transmitter_ 2, 800.00
1 Voltage regulator- 16. 78
1 Vise (screw)- 19.58
3 transformers_ 42.18
1 Loud Speaker, Western Electric_ 49. 41
1 Camera, Rolleiflex, case, accessories_ 211.20
Total_3, 671. 78
5. You attempted to llave official purchases shipped through the Chilean Air Force rather than by established USOM channels which enable routine treatment for proper accounting and inventory records of materials received.
You have a right to answer these charges personally and in writing and to furnish affidavits and other evidence in support of your answer. You are given five (5) calendar days in which to make your answer.
This notice is a notice of proposed adverse action in accordance with Section 14 of the Veterans Preference Act of 1944, as amended, 5 U.S.C. 868. You will continue in an active duty status unless you apply for leave and it is granted.
15. On October 10, 1956, plaintiff replied to the letter of charges, as follows:
In reply to your letter of October 5, 1956,1 welcome the opportunity to reply to the charges contained therein. By way of introduction I am taking the liberty of setting down my initial reactions to, and considered opinions of the charges. I do this in the belief that this will help supply the background that I respectfully submit is necessary to a full understanding of this matter.
First of all, although I ask no special quarter for myself, I do implore you that in making your decision you bear in mind that what is at stake here is the career of a man who firmly believes that he has served the Government faithfully and efficiently for twenty-three years.
Secondly, may I state that the charges came as a distinct shock to me. Please understand that the first indication I had that all was not well was the appearance of investigators in Chile who in fact told me that they were investigating the onduct of Lawrence Clark, a subordinate of mine with whom I had been having considerable difficulty. In the two years prior to the *509 investigation. I bad received virtually no complaints on my conduct or performance, and consequently I am puzzled about how and why I am so suddenly faced with discharge. The series of charges are, as I shall later explain, partly true and mostly false or misleading. The point I wish to raise here is that — if the charges were true and are now considered serious enough to propose my discharge, why were they not considered serious enough to even warrant mention from my superiors at the time they occurred ?
My final request to you is that in your deliberations you consider carefully the somewhat peculiar situation under which I was working during the period in question. I was, of course, employed by the Department of Commerce, but was assigned to a foreign mission under the jurisdiction of the International Cooperation Administration. The two agencies operated under the Memorandum of Agreement referred to in the charges, and as can be expected when a man serves two masters, crossed wires sometimes occurred. In my opinion the operation in Chile under the Memorandum of Agreement worked out rather well. My purpose in mentioning the dual control situation is to suggest to you that it might very well have been the underlying cause for my present difficulties. In this connection I must point out that Charles Gannon who headed up the investigation in Chile was an employee of ICA. It is certainly not my intention to question his competence or his good intentions or those of any other employee in ICA, but I do vigorously challenge the opinions and conclusions expressed in the charges against me which, for want of further knowledge, I assume are those of Mr. Gannon.
In reviewing the record I strongly urge that you balance the opinions of the investigators who spent about two weeks on the scene, against the opinions of those like myself who spent two years in Chile doing our best under the many trying demands of the situation.
For purposes of clarity I will answer the charges in the order in which they are listed in your letter:
1. I categorically deny not having performed my duties in accordance with the provisions of the Memorandum of Agreement between the Civil Aeronautics Administration and the Foreign Operations Administration. Upon receipt of the Memorandum of Agreement I acquainted myself with its contents and to the best of my ability complied with the provisions contained therein.
*510 (a) I deny that I failed to provide copies of communications on technical matters to the ICA Overseas Mission at Santiago. As a matter of course I instructed my administrative assistant, Julio Navarrete, and my typist, Carmen Holtzhauer, that copies of such correspondence were to be forwarded to ICA, and to the best of my knowledge this was done. This can be verified quite simply by Mr. Navarrete and Miss Holtzhauer, and in fact is a matter of record in the files which may be examined in the Chile correspondence file in the office of the International Region in Washington.
While I am sure that the record will show that the required forwarding was done as a matter of course, I do not deny that certain correspondence may not have been furnished the USOM through unintentional oversight or clerical error. May I suggest further that misunderstanding may also have led to this charge since the element of interpretation enters when one decides which correspondence must be forwarded. I draw your particular attention to a letter to me from the Regional Administrator of the International Region dated July 7, 1955 wherein the Administrator stated: “We do not intend to have FOA question our selection (of personnel) from a technical point of view and any inquiries our people in the field may have in this regard should always be directed to this office without reference to FOA.”
(b) I deny having attempted to import a second personal car duty-free through Mr. Cruz. This charge standing alone would give the appearance of my having acted in an underhand manner. Nothing could be further from the truth since as Mr. Cruz will acknowledge, my intentions were thoroughly honorable.
While in Chile my automobile was involved in accidents which rendered it virtually useless. I therefore tried to obtain permission of the Embassy in Santiago to import a replacement for it. I recall having questioned Mr. Cruz who was assigned to my office as Legal Adviser, concerning an interpretation of the Executive Order of the Government authorizing the import of personal vehicles. At no time did I make an attempt through him to obtain such importation or to gain his help in securing permission for such importation.
(c) I deny having requested additional technical personnel without obtaining prior clearance from the USOM in Chile. I respectfully draw your attention to the fact that all such requests are made in the form of an AIRPAR which is the ICA form for the classification of a position and for personnel action to fill the *511 position, and this request is made over the signature of the Director of the USOM. In the case of the short term detail of personnel to Chile from the Kegional Group in Panama, initial inquiries were made of the Director of the Group as to the availability of personnel, but before the final request was made it was invariably cleared with the USOM which in turn cleared with the Embassy prior to the detail of such personnel. From time to time CAA personnel of the Group, IFO’s and IDO’s, did travel to and through Chile without clearance, but these visits were not made at the request of the CAA Mission. In most cases the USOM was advised of such visits.
I did make a preliminary inquiry of my superior, Mr. Evan J. Lewis, concerning a replacement for the aforementioned Lawrence Clark without first clearing through ICA. (See copy of my letter * * *). I considered this perfectly in order and still do, since I was simply trying to ascertain the position of my superior in an extremely embarrassing situation. You will note that in the fourth paragraph of my letter I mention that the actual replacement would, of course, have to be cleared through ICA.
Whether the Lawrence Clark incident is the one referred to in this charge I have no way of knowing. My attorney has made an inquiry by phone of Mr. Charles Peters, and has been informed that since the record has been classified by ICA further information is not available.
(d) I freely admit that I attempted to obtain a Chilean license for a Government vehicle through a Chilean Air Force channel. I most emphatically deny that I acted improperly in so doing, and indeed I maintain that my action was intended to be and was in the best interests of the United States Government.
Upon receipt of the first vehicle purchased by the Mission it was suggested by the liaison officer assigned to my office by the Director of Aeronautics that the vehicle be furnished official license plates by the Ministry of Defense in order to facilitate the movement of the vehicle and its access to government and military installations and facilities. This sounded like a good idea for expediting the work of the Mission and I asked the Director to obtain such license plates if it was possible to do so without in any way affecting U.S. Government ownership of the vehicle. It was found that this could be done, but that registration would be in the name of the Chilean Air Force. Even though this did not affect the U.S. Government ownership of the vehicle I decided *512 that the registration should be in the name of the TTSOM and requested them to so register the vehicle.
(e) I deny having loaned an official carry-all to the Chief of the Santiago Airport. I did assign a vehicle to the Air Traffic Control Specialist of the Mission for use at the airport and advised him that when the vehicle was not being used for his purposes that it could be used around the airport for other official purposes provided such use had his approval and the vehicle remained under his control at all times. This was stated in a letter to the Chief of the Airport who was furnishing all operating and maintenance expenses for the vehicle.
2. I deny having embarrassed the American Embassy or the United States Operations Mission in their relations with the Chilean Foreign Office. At no time during my two years in Chile did I receive any indication that I embarrassed the Embassy.
Since this charge consists solely in a matter of opinion, I respectfully refer you to the following gentlemen whom I consider to have been in the best position to form opinions on this matter:
Ambassador Willard Beaulac, now Ambassador to Argentina; Mr. William Sanders, then Counselor of Embassy, now a member of the U.S. Delegation to the United Nations; Mr. Arthur Day, Commercial Attache; Mr. Frank Devine, Commercial Attache; Colonel Neil McKay, Air Force Attache.
I deny having at any time engaged a Chilean intermediary to tender in my behalf a letter to the Ministry of Foreign Affairs requesting permission to import a second car duty-free. I did submit such a request to the Embassy and subsequently received denial of such permission, whereupon the matter was dropped.
3. I deny ever having used a Government vehicle for other than Government purposes. I did leave a Chevrolet carry-all at my residence in "Vina del Mar while I was on a trip to Easter Island. I deny that there was anything improper intended or in fact in this action. The vehicle was in safe keeping, garaged in my garage at my own expense, and readily available to my office in Santiago at any time authorized personnel might need it.
The charge that the carry-all was used by my family for private purposes is probably based on the use of the car by my wife on a few marketing trips during the few weeks that the vehicle was at my house. I frankly do not know what the regulations would say about *513 such use. I can only say that I do not consider it out of the ordinary for a Government employee’s wife in a foreign country to make isolated use of a Government vehicle assigned to him when no other transportation is available. In passing on this charge I ask that you consider my intention in the matter, and the relatively insubstantial nature of the charge in a proceeding which concerns my entire career.
4. I freely admit that I retained the Government property listed in this item in my personal residence. I deny that there was anything improper in this action. As Chief of the U.S. Civil Aviation Mission in Chile and as Chief of the Civil Aviation Division of the USOM I felt that I had certain responsibilities for the protection and safe keeping of Government property that was purchased for and assigned to my office. I did not know and still do not know of any permission that was needed to fulfill this responsibility or that was needed for me to store equipment or any other property of the U.S. Government m my house, garage or any other location that might be appropriate for its safe keeping. I did store in my house and garage certain equipment pending provision by the Chilean Government of more adequate quarters where this equipment could be stored or otherwise suitably installed and put to use. I also maintained an office in my home since much of my correspondence and other official work in connection with carrying out my mission had to be done at night and on weekends. This was caused by a heavy schedule of work and contacts that normally took place during office hours. I also did not have a stenographer in my office and therefore had to personally write all my official correspondence.
5. I admit that I attempted to make arrangements to have official purchases shipped through the Chilean Air Force rather than by established USOM channels, but I deny that anything improper was intended or accomplished by my action.
I did attempt to make arrangements with the USOM and had the verbal approval of the Executive Officer of the USOM at one time to have shipments of equipment and material ordered for the CAA Mission consigned to the Chilean Air Force in Santiago. My reason for attempting to set up this arrangement was to save the U.S. Government money in terms of customs agents fees and transportation from Valpariso to Santiago since by this means the customs agent and transportation of the Chilean Government would be used which seemed *514 to me to be a reasonable and legitimate contribution to the program that might be required of the Chilean Government. By this process there would also be saved from 1 to 2 months of delay of delivery of shipments to my office after they arrived in Valpariso. This was normal delivery time whereas if handled by the Chilean Air Force shipments could be received in a matter of 2 to 3 days after the ship 'arrived in Valpariso. The Government of Chile was willing to bear this expense, but the Director of the USOM decided against it and consignments continued to be made to the USOM. It was decided by one of the Business Managers of the USOM, Mr. Dean Turley, that this process would disrupt the accountability records, but I fail to see how this could happen since all documents relative to the order and its shipment and receipt would be processed through the USOM and accountability would be accomplished in the usual manner.
These then are my answers to the charges in your letter. I feel certain that I could document them in much greater degree with sworn statements from the parties closest to the situation, but distance and the work involved prevent my doing this within my allotted five days. You do have available to you, however, an accurate measure of my performance. My efficiency reports over long years of Government service with the Department represent solid proof, I believe, of my dependability, my cooperativeness, and my devotion to duty.
I have 'asked myself over and over during the past five days — have I changed so much overnight as to be the man represented in the charges? The only answer there can be is — certainly not.
I respectfully request that you reconsider your proposal to discharge me, and stnke the charges from my record.
16. On October 24, 1956, the Personnel Officer of CAA responded to plaintiff’s reply:
* * * We have reviewed your answers and have found them to be unsatisfactory with respect to the matters described in Charge No. 1, as specified in Specifications (a), (b), (d), and (e), each of which specifications fully supports Charge No. 1, and with respect to the matters described in Charges Nos. 2, 3,4, and 5. We have determined that each of the charges and specifications stated in our October 5 letter to you, except Specification (c) of Charge No. 1, constitutes a matter which requires *515 your discharge in accordance with Section 14 of the Veterans’ Preference Act of 1944, as amended, that is, constitutes “such cause as will promote the efficiency of the service” within the meaning of said Section 14. In reaching this conclusion, we neither relied on nor were influenced in any way by the contents of Specification (c) of Charge No. 1.
Accordingly, you are hereby notified that a final decision has been made to remove you from the service effective at the close of business November 16, 1956. This adverse decision has been made in accordance with Section 14 of the Veterans’ Preference Act of 1944, as amended.
If you desire, you may appeal this decision under the appeals procedure established by Department of Commerce Administrative Order No. 202-2. Your appeal under this procedure must be made within ten days from the date you receive tins letter. Your appeal should be addressed to Mr. James T. Pyle, Acting Administrator of Civil Aeronautics, Civil Aeronautics Administration, Attention: Chairman, Board of Grievance Review.
As a veteran you also have the right to appeal this decision to the Civil Service Commission under Section 14 of the Veterans’ Preference Act of 1944, as amended, within ten calendar days after the effective date of your removal. Such appeal should be addressed to Chief, Appeals Examining Office, Bureau of Departmental Operations, U.S. Civil Service Commission, Washington 25, D.C. However, you should understand that if an appeal is accepted 'by the Civil Service Commission no further appeal of your removal may be made under the Department of Commerce appeals procedure, and action on any appeal you may have already made will be discontinued. * * *
17. On October 25, 1956, plaintiff filed his appeal with the Administrator of CAA, by whom it was referred to the Board of Grievance Review. Following is the text (in pertinent part) of the Board’s report to the Administrator, filed on November 28,1956:
ACTION APPEALED
Mr. George S. Clark, Chief, Civil Aviation Mission, * * * Santiago, Chile, * * * has appealed his removal from the service by the Personnel Officer, * * *
This action was appealed on the basis that Mr. Clark felt the action was—
(1) Not a reasonable exercise of administrative dis *516 cretion as required by Section 6.02 of Administrative Order No. 202-2; and
(2) Was not supported by a substantial amount of reasonable evidence that it will promote the efficiency of the service.
In support of his appeal, a memorandum consisting of four pages was submitted by his attorney, Mr. Walter E. Dillon, Jr. Messrs. Clark and Dillon also appeared at an oral hearing before the Board. Affidavits and oral testimony was furnished at this hearing.
In its review of the case, the Board considered the submissions mentioned above; the submissions of the Personnel Officer; and oral statements of Mr. Lawrence E. Clark, a former member of the CAA Mission to Chile.
HISTORICAL BACKGROUND
On May 9, 1954, Mr. Clark was assigned _ as Chief, Civil Aviation Mission, Santiago, Chile. Prior to this assignment, Mr. Clark had served for approximately 20 months as Chief of the International Legion’s Technical Assistance Division and in this capacity was involved in the negotiation of the Memorandum of Agreement between the Department of Commerce and the Foreign Operations Administration which governed the relationships and administrative operations of CAA’s overseas missions.
An investigative report of the ICA, dated July 24, 1956, was received through Security channels of the Department of Commerce alleging that Mr. Clark administered the project without regard to regulations, of the United States Operations Mission and in violation of the agreement between the Department of Commerce and the Foreign Operations Administration and that his attempt to import a second personal car duty free embarrassed the American Embassy in its relations with the Chilean Foreign Office. The report further alleged various violations of Government regulations and general maladministration on the part of Mr. Clark.
A study of this report resulted in charges being made against Mr. Clark on October 5, 1956. Following review of Mr. Clark’s reply to the charges, the Personnel Officer advised him that he was to be removed from the service.
The charges preferred against Mr. Clark were—
(1) Mr. Clark did not perform his duties in accordance with provisions of the Memorandum of Agreement between the CAA, Department of Commerce and For *517 eign Operations Administration (predecessor of ICA) dated Jnne 10, 1954.
(2) Mr. Clark embarrassed the American Embassy and the United States Overseas Mission in its relations with the Chilean Foreign Office in that his intermediary, a Chilean National, tendered on his behalf (Mr. Clark’s), directly to the Chilean Foreign Office, a letter requesting permission for Mr. Clark to import a second car duty free, together with invoices purporting to show that his first car had been wrecked.
(3) Mr. Clark used a Government vehicle for other than official purposes in that he left an official carry-all with his family at his summer residence at Vina del Mar during his five to six weeks absence from the Chilean mainland while on official business at Easter Island and the carry-all was thereby used by his family for private purposes.
(4) Mr. Clark retained without permission in his personal residence Government property costing in excess of $3600.
(5) Mr. Clark attempted to have official purchases shipped through the Chilean Air Force rather than by established USOM channels which enabled routine treatment for proper accounting and inventory records of materials received.
APPLICABILITY OP LEGAL PROVISIONS
Veterans’ Preference Act of 1944, as amended; Department of Commerce Administrative Order No. 202-2 relating to grievances, employee complaints and appeals. The provisions of the above have been complied with.
EVIDENCE AND PINDINGS
Following a review by members of this Board of the written material submitted in the case, the Board convened on November 14, 1956. Mr. Clark and his counsel were present and added affidavits in his behalf as well as oral testimony in support of his appeal. In addition, on November 15, the Board requested and heard oral testimony from Mr. Lawrence E. Clark, Electronic Engineer, GS-13, which aided the clarification of certain facts which were included in the Board’s deliberations.
Of the five charges made against Mr. Clark, the Board found that the evidence available fully supported the following:
(1) Failure to perform duties in accordance with the Memorandum of Agreement between the Depart *518 ment of Commerce and the Foreign Operations Administration; and
(2) Use of a Government vehicle for other than official purposes.
In considering the charge that Mr. Clark embarrassed the American Embassy and the USOM in connection with the attempt to import a second personal automobile, the Board found that the evidence fully supports the view that the USOM was embarrassed. Affidavits of several individual officials of the Embassy indicate that they personally knew of no embarrassment to the Embassy. Further, no direct or definite evidence that the Embassy, per se, was embarrassed was furnished. However, in view of the fact that the USOM is a part or division of the Embassy, as the International Cooperation Administration is a part of the Department of State, the Board feels that by embarrassing the USOM, Mr. Clark also indirectly embarrassed the Embassy.
In connection with the charge that Mr. Clark retained without permission in his personal residence Government property costing in excess of $3600, the Board was unable to secure testimony or information indicating that such storage would or did require permission of the USOM or any other higher echelon. Therefore, while the Board recognizes that the charge, as made, is true, it feels that the facts do not warrant such a charge. It is noted, however, that certain Government radio communications equipment was stored in Mr. Clark’s garage. This same garage was used by him as a personal radio and hi-fi hobby shop. The Board feels that the mixing of this equipment was not proper and that this action casts grave doubt as to Mr. Clark’s judgment.
In connection with Charge No. 5, which charges Mr. Clark with attempting to ship official purchases through Chilean Air Force channels rather than normal USOM channels, the Board again found that the charge as made is true. Again, however, the Board doubts as to whether this action should be the basis of a charge. It is recognized, however, that Mr. Clark’s action appears to be typical of his efforts to free lance and separate the CAA Mission from its appropriate place in the USOM organization. Further, the Board notes a glaring omission in the fact that Mr. Clark did not present an affidavit supporting his claim that he had previously cleared this action with a member of the USOM. Affidavits were furnished in support of each of his other claims.
Based upon its study of the evidence, the Board finds as follows:
*519 (1) That Charges Nos. 1 through 3 are fully sustained.
(2) That while Charges Nos. 4 and 5 are true statements, they are not a valid basis for charges.
(3) That Mr. Clark, being an individual who assisted in the preparation of the Memorandum of Agreement and, therefore, fully cognizant of its intent as well as content, nevertheless deliberately set out to promote himself and the CAA Mission by evading and obstructing compliance with the terms of this agreement.
(4) That grave doubt exists as to Mr. Clark’s judgment and trustworthiness as a result of his actions m Santiago.
(5) That the action taken by the Personnel Officer was a reasonable exercise of administrative discretion as required by Administrative Order No. 202-2.
RECOMMENDATION
In view of its findings, the Board recommends that the Administrator sustain the action taken.
18. (a) On November 27,1956, the Administrator of Civil Aeronautics wrote to plaintiff’s attorney:
The Civil Aeronautics Administration’s Board of Grievance Keview has completed its consideration of the appeal of Mr. George S. Clark and has made its report to me. I have thoroughly reviewed the entire case as well as the Board’s report.
My review indicates that while the statements made in Charges four and five are true, they do not constitute a valid basis for charges. They are, therefore, withdrawn. However, I find that Charges one, two and three are valid and are also fully supported by the evidence. Therefore, I sustain the action taken by the Personnel Officer in proposing Mr. Clark’s removal from the service effective November 30,1956, for the reasons contained in Charges one, two and three.
(b) Plaintiff was thereupon separated from the service, effective at the close of business on November 30, 1956.
(c) As heretofore noted, plaintiff appealed to the Civil Service Commission, which declined to review his case.
(d) An appeal to the Secretary of Commerce was likewise unavailing.
(e) Plaintiff had exhausted his administrative remedies when the present action was filed.
*520 19. (a) The Personnel Officer, as stated in his letter of October 24, 1956, reviewed plaintiff’s answers, “found them to be unsatisfactory * * and notified him that “a final decision has been made to remove you from the service * * asserting that:
* :!: * each of the charges and specifications stated in our October 5 letter to you, except Specification (c) of Charge No. 1, constitutes a matter which requires your discharge * * * that is, constitutes “such cause as will promote the efficiency of the service” * * *
(b) The initial decision to discharge plaintiff was the decision of the Personnel Officer. In making it, he relied on the reports of the ICA investigator and the opinions of the men with whom he had conferred. Pie testified that it was his considered opinion that the report of the ICA investigator established a lapse or lapses of judgment on the part of plaintiff in his tour of duty in Santiago.
(c) In arriving at Ms decision to discharge plaintiff, the Personnel Officer gave consideration to plaintiff’s length of service. It was his opinion that because of so many years of experience, plaintiff should have known better than to permit himself to get into such a fix. The Personnel Officer had had no indication that anyone in ICA wanted to have plaintiff discharged. Neither did he have the feeling that his administrative superiors in CAA were looking over his shoulder “any more than any other case.” With respect to penalizing plaintiff, in the sense of making an example of bim, the Personnel Officer testified that “that might have been part of the consideration” but that “the bigger part of the situation here is an individual at a Mgh grade * * * in a responsible position * * * with this type of a lapse in judgment * *
(d) In arriving at his decision, the Personnel Officer did not review or give any consideration whatever to plaintiff’s personnel folder (with its letters of commendation) or to Ms performance ratings.
(e) In arriving at his decision, the Personnel Officer was fully aware of the consequences of the discharge action in terms of plaintiff’s employment future. He knew that the discharge would becloud plaintiff’s record in such a manner *521 as to constitute a handicap for the rest of his life. In the judgment of the Personnel Officer, these consequences would not warrant retaining a person when there was a demonstration that such retention would be detrimental to the service.
(f) In arriving at his decision, the Personnel Officer considered the possibility of restoring plaintiff to a position in the classified service of CAA. He reasoned that plaintiff’s field of competence in the higher grades was such as to restrict his employment in such grades to the international field and that plaintiff had, by demonstrated lapses of judgment, disqualified himself for that field. Restoration of plaintiff to the same or a similar position to the one last held by him in the classified service was therefore not considered. The Personnel Officer decided not to offer plaintiff a lower position because he concluded that plaintiff could never satisfactorily adjust to a position as lowly as anything the Personnel Officer would be willing to offer him.
20. (a) Plaintiff’s appeal to the Administrator of CAA was founded on his contentions that the action of the Personnel Officer was—
(1) Not a reasonable exercise of administrative discretion * * * and
(2) Was not supported by a substantial amount of reasonable evidence that it will promote the efficiency of the service.
(b) Both the Board of Grievance Review and the Administrator of CAA, in their respective reviews of the Personnel Officer’s action, addressed themselves to the grounds of appeal asserted by plaintiff. In each instance, the reviewing authority sustained the action of the Personnel Officer “for the reasons contained in Charges one, two and three.”
21. (a) Following is a recapitulation of the three charges sustained by the Board of Grievance Review and the Administrator of CAA as the grounds for plaintiff’s discharge.
Charge 1. Failure to perform duties in accordance with the Memorandum of Agreement between CAA and FOA.
Specification (a). Failure to provide USOM with copies of technical reports forwarded to CAA at the same time.
Specification (b). Attempting to import a second personal car duty-free by contacting a Chilean associate, Señor Cruz, instead of processing the request through USOM.
*522 Specification (d). Attempting to obtain a Chilean license for a Government vehicle through a Chilean Air Force channel instead of processing the request through USOM.
Specification (e). Lending an official automobile to the Chief of the Santiago Airport.
Charge 2. Embarrassing the Embassy and USOM in its relations with the Chilean Foreign Office in that plaintiff’s intermediary, a Chilean national (Señor Cruz), tendered on plaintiff’s behalf directly to the Chilean Foreign Office a letter requesting permission to import a second car duty-free, together with invoices purporting to show that plaintiff’s first car had been wrecked.
Charge 3. Use of a Government vehicle for other than official purposes in that plaintiff left an official car with his family at his summer residence at Viña del Mar during his absence of 5 or 6 weeks on an official tour of Easter Island, the Government vehicle being used by plaintiff’s family for private purposes.
(b) Following are findings of fact in relation to the foregoing charges and specifications based on the evidence adduced in the trial of this case.
Charge 1. Specification (a). Admitted by plaintiff in his initial interviews in Santiago with the ICA investigator. The gravamen of the charge was not failure to provide USOM with copies of his communications to CAA, but failure to provide such copies at the same time. The effect of the time lapse upon the administration of USOM is not fully explained by the evidence. Such evidence as there is on the point indicates that USOM’s inability to review plaintiff’s communications to CAA at the time of or very shortly after their dispatch was a source of irritation to USOM in terms of programing and budgeting.
Charge 1. Specification (b). Plaintiff’s version of this episode must be accepted as true on the basis of the evidence. The personal car he took into Chile in June 1954 had been involved in a series of mishaps. It was damaged almost beyond use. He needed and wanted a replacement. He knew the regulations forbade importation of another car before the expiration of 2 years. He hoped an exception might be made and the regulation relaxed because of the *523 circumstances. He prepared a letter, to which, he attached invoices showing the expense incurred in repairing his damaged automobile, and submitted it to the Embassy clerk (a Chilean woman), who denied the request. Then there came to plaintiff’s attention a Chilean regulation which he thought might have authorized an exception in his case. He asked Señor Cruz, who was assigned to his office by the Chilean Government as a legal adviser, for an interpretation. He gave Señor Cruz the letter which he had prepared earlier. Instead of reading the law and proffering an opinion, Señor Cruz took the letter to the Foreign Office and made inquiry.
On these facts it is not established by the evidence that plaintiff actually made the attempt to import a second car duty-free. He intended to make the attempt, through USOM, if the Chilean regulation meant what he thought it did; but the evidence does not establish an intention to attempt the importation without processing the request through USOM.[15]
Charge 1. Specification (d). Admitted by plaintiff in his letter replying to the charges.
* * * I freely admit that I attempted to obtain a Chilean license for a Government vehicle through a Chilean Air Force channel. I most emphatically deny that I acted improperly in so doing, and indeed I maintain that my action was intended to be and was in the best interests of the United States Government.
At the beginning of plaintiff’s tour of duty in Santiago, no official vehicles were available to the Civil Aviation Party. Plaintiff worked out an arrangement whereby USOM would assign vehicles to his party, and the Chilean Air Force would provide the fuel and the maintenance. The vehicle in question in this specification had just arrived in Santiago for allocation to plaintiff’s party under this arrangement.
There is no evidence to refute plaintiff’s explanation of his action, which is accepted as reflecting the truth of the matter.
Upon receipt of the first vehicle purchased by the Mission it was suggested by the liaison officer assigned *524 to my office by tbe Director of Aeronautics that the vehicle be furnished official license plates by the Ministry of Defense in order to facilitate the movement of the vehicle and its access to government and military installations and facilities. This sounded like a good idea for expediting the work of the Mission and I asked the Director to obtain such license plates if it was possible to do so without in any way affecting U.S. Government ownership of the vehicle. It was found that this could be done, but that registration would be in the name of the Chilean Air Force. Even though this did not affect the U.S. Government ownership of the vehicle I decided that the registration should be in the name of the USOM and requested them to so register the vehicle.
Charge 1. Specification (e). Again there is no evidence to refute plaintiff’s denial of the charge as made or his explanation of the event. It is accepted as true.
(e) I deny having loaned an official carry-all to the Chief of the Santiago Airport. I did assign a vehicle to the Air Traffic Control Specialist of the Mission for use at the airport and advised him that when the vehicle was not being used for his purposes that it could be used around the airport for other official purposes provided such use had his approval and the vehicle remained under his control at all times. This was stated in a letter to the Chief of the Airport who was furnishing all operating and maintenance expenses for the vehicle.
Charge 2. The facts pertaining to plaintiff’s actions in relation to the importation of a second personal car are set forth above under Charge 1, Specification (b).
Plaintiff denies having embarrassed either the Embassy or USOM in their relations with the Chilean Foreign Office. He asserts that the charge is a matter of opinion and refers to five Embassy officials as having “been in the best position to form opinions on this matter.”
It is true that none of the Embassy officials above the clerical level knew of the call from the Foreign Office to the Embassy clerk. They were therefore not embarrassed. The charge is that plaintiff’s actions embarrassed the American Embassy and the United States Overseas Mission in its relations with the Chilean Foreign Office. USOM learned of the Foreign Office call to the Embassy clerk and was embarrassed by it. Insofar as the charge equates the Embassy *525 and USOM as a single entity, it is true that the result of the action by Señor Cruz (the telephone call from the Foreign Office to the Embassy clerk) was a source of embarrassment.
Charge 8. This charge as drawn is an overstatement in terms of personal use of an official car and incomplete as to the real fault of the act.
In making preparations for a trip to Easter Island, sailing from Valparaiso, plaintiff took the surveying party which was to accompany him, with its equipment, using the official car in question, for the trip from Santiago to Valparaiso. He and his party made extensive surveys in the vicinity of Valparaiso before they left for Easter Island. Upon their departure, he sent the car to his summer residence at Viña del Mar, just outside of Valparaiso. While he was gone, his wife used the car for a few marketing trips and on one occasion to take a child to the dispensary for medical attention.
The personal use was thus not extensive. Mrs. Clark did not use the Government vehicle freely as a substitute for the family’s personal car.
The essence of the matter, as seen by the Director of USOM-Chile, when it came to his attention, was that in retaining the car at Viña del Mar, instead of sending it back to Santiago, plaintiff had monopolized official transportation which should have been available, during his extended absence, to the technical assistants assigned to his party. In these terms the charge is established by the evidence.
(c) By way of summary of the foregoing, the evidence warrants the conclusion that plaintiff was at fault in the following particulars:
(1) He failed to provide USOM with copies of technical reports forwarded to CAA at the time of such forwarding;
(2) He was not as meticulous as he might have been in observing the channels of USOM (i) when he entrusted Señor Cruz with the letter which Señor Cruz took to the Foreign Office; (ii) when he attempted to obtain a Chilean license plate for an official vehicle by going through a Chilean Air Force channel; and (iii) when he permitted the use of an official vehicle by Chileans at the Chilean airport; and
(3) He monopolized available official transportation when *526 lie left the carry-all at his summer residence while he made a trip to Easter Island.
(d) On the basis of the facts as summarized in the preceding paragraph, the penalty of discharge was grossly disproportionate to the fault established.
22. (a) Plaintiff, appearing as a witness in his own behalf, disclaimed charges of bias toward or personal prejudice against himself on the part of the Director of USOM-Chile, the Personnel Officer of CAA, the members of the Board of Grievance Review, or the Administrator of Civil Aeronautics. It is not established by the evidence that any of these officials, or the officials with whom the Personnel Officer conferred in making his decision, were animated by such a bias or prejudice.
(b) In his appearance as a witness in his own behalf, plaintiff has presented his case in this court on grounds identical with his contentions in his appeal to the Administrator of CAA, namely, that the action of the Personnel Officer in ordering his discharge, the recommendation of the Board of Grievance Review, and the decision of the Administrator sustaining the action of the Personnel Officer were—
(1) Not a reasonable exercise of administrative discretion * * * and
(2) Not supported by a substantial amount of reasonable evidence that [his discharge] will promote the efficiency of the service.
(c) The evidence adduced at the trial of the case sustains the contentions of plaintiff as summarized in the preceding paragraph.
23. (a) The Director of USOM-Chile, in asking for the recall of plaintiff by CAA, was concerned only with his own standards for the performance of his job. Plaintiff had flouted some of these standards (by failing to maintain liaison with USOM) and openly violated others (by monopolizing official transportation).
(b) The Director of USOM-Chile was meticulously concerned with the maintenance of relations, according to his own standards, between the USOM of ICA and CAA. He was at pains to see that CAA-Washington was fully advised *527 of the reasons for his action in requesting the recall of plaintiff.
24. (a) The Personnel Officer of CAA, in ordering plaintiff’s discharge, was likewise concerned only with the performance of his job according to his own standards. He had before him, the recommendation of plaintiff’s administrative superior (the Acting Administrator of the International Eegion) for application of “the maximum appropriate disciplinary action” to the end that plaintiff should never again “hold a position of responsibility in the CAA.” Three other officials in the International Eegion concurred in this recommendation. The Personnel Officer likewise had knowledge of the recent action of his administrative superior, the Administrator of CAA, in summarily relieving the Administrator of the International Eegion of the responsibilities of office without prior consultation or warning.
(b)In ordering the discharge of plaintiff, the attitude of the Personnel Officer toward plaintiff was wholly impersonal and indifferent to the effect it would have on plaintiff’s career.
25. (a) There is no explicit evidence to show that the judgment of the members of the Board of Grievance Eeview in sustaining the action of the Personnel Officer was not an honest judgment that the action of the Personnel Officer was (1) a reasonable exercise of administrative discretion and, (2) supported by a substantial amount of reasonable evidence that it would promote the efficiency of the service.
(b) The attitude of the members of the Board toward plaintiff was wholly impersonal and indifferent to the effect it would have on plaintiff’s career.
(c) There is no explicit evidence to show that the judgment of the Administrator of CAA in adopting the recommendation of the Board of Grievance Eeview was not an honest judgment that the discharge of plaintiff was a reasonable exercise of administrative discretion supported by substantial evidence.
(d) The attitude of the Administrator of CAA toward plaintiff was wholly impersonal and indifferent to the effect it would have on plaintiff’s career.
26. Following is the text of the ICA investigator’s pre *528 liminary report to IC A-Washington, prepared in Santiago on June 21,1956:
In accordance with, your instructions, this matter was investigated jointly by Mr. Edward Warner of CAA/W and the writer and this letter will give you a brief resume of the matter as it now stands.
1. The CAA field representative is authorized to report directly to Washington on technical matters and is only required to advise USOM/Chile. This matter was •fully discussed by Messrs. Patterson and Bryant of USOM/Chile, Mr. Warner of CAA/W and the writer. It has been agreed that the instructions are clear enough but as interpreted and carried out by Mr. George Clark the timing was bad in that the advising phase of the instructions should be closer, in point of timing, to the actual time the field representative — Mr. Clark — reported directly to CAA/W.
2. With regard to matters involving the need for additional technical men, the CAA field representative should request these through the regional CAA Office in Panama.
The interpretation of the Field Bepresentative on this matter was not entirely in conformity with that placed upon this regulation by the Mission Director. It has been agreed, in the discussion held with Mission Director Patterson, Deputy Bryant, Mr. Edward Warner, CAA/W and the writer that this rule must necessarily have the prior concurrence of USOM/Chile in that the name must be cleared with the Chileans and the facts surrounding the need of the presence of the technician made known to the proper Chilean authorities along with other necessary steps required in connection with the importing of a technician into Chile.
3. Matters pertaining to administration of CAA/ Chile, such as travel, personal conduct, etc., should be under the direction of the director, USOM/Chile.
The instructions under this general title were discussed at length with Mr. George Clark, CAA/Chile by Mr. Edward Warner, CAA/W and the writer. Mr. Clark contended that he had the impression that personnel matters within CAA/Chile were under his control and jurisdiction and that he should be free to handle them as he saw fit.
Mr. Clark cited the Memorandum of Agreement between Department of Commerce and Foreign Operations Administration, page 3, Section 2, OVERSEAS, Section (b) Communications, which, in part, is as follows: *529 Department personnel may send official communications directly to the Department on technical operating and personnel matters pertaining to a project. Copies of all such communications will be provided the USOM at the same time. * * *
Mr. Clark admitted that he had not complied with this portion of the agreement in that copies of his communications had not been provided at the same time. It was explained to Mr. Clark that any change in personnel of CAA/Chile must, of necessity, be made only with the concurrence of the Director, USOM/Chile since it was the latter’s responsibility to maintain good relationship with the Chilean authorities, including permission to add or remove a technician of any type and to obtain the necessary clearance therefor.
It is believed that Mr. Clark, Chief of Party, CAA/ Chile, now has the proper concept of this phase of the regulation after he had the opportunity to discuss the matter thoroughly with Mr. Warner, CAA/W and the writer. Of course the entire matter was discussed with Mission Director Patterson initially to obtain his concept of all these regulations.
Another phase of dispute concerned a contact made with the Chilean Foreign Office by a man named Cruz, in an effort to get permission for Mr. Clark to import a second automobile, duty free, since his original imported car had been wrecked. Mr. Clark stated that he had been approached by Mr. Cruz, a Chilean associate, who advised him — Clark — that it would be possible to import another car, duty free, since the original import had been wrecked. He requested Mr. Cruz to look into the matter and this resulted in contact being made with the Foreign Office and thereby potentially embarrassing the officials of the U.S. Embassy for this unorthodox procedure.
Mr. Clark stated that he did not know that Mr. Cruz would contact the Foreign Office. It was pointed out to him that USOM/Chile has staff members charged with handling such matters as car importation and that he should have sought advice and council [sic] through these channels. Additional information must be gathered and reported on this matter.
Mr. Patterson stated that he had a high regard for the work that had been done by CAA in the two years that the program has been established in Chile. However, he feels that Mr. Clark has not been completely responsive and loyal in his dealings with him as USOM Director.
*530 Mission Director Patterson stated that be would not make any administrative decision at this time as to the removal of Mr. Clark or, with regard to his return after his home leave. It might be noted that Mr. Clark has completed his two years but has elected to remain until December in order to permit his children to finish out the school term.
Mr. Patterson is also reserving decision as to requesting the recall of Mr. Clark prior to December. He stated that he would want more facts before reaching this decision. The investigation by the writer will continue until the full facts have been developed and presented to Mr. Patterson.
27. Following is the text of the CAA investigator’s report of June 27, 1956, to the Regional Administrator, International Region, CAA:
On June 14, 1956, the undersigned in company with * * * Acting Chief, Technical Assistance Division, went to the ICA offices to discuss the contents of * * * dispatch wherein the DUSOM in Chile requested the services of ICA/PSI inspector due to receiving information of irregularities in activities on the part of CAA personnel in Chile. In addition, the DUSOM in Chile requested a CAA/W representative travel to Chile immediately and participate in an investigation with the PSI inspector. Later it was decided the undersigned would represent International Region Headquarters and the ICA was so advised. They in turn advised their inspector located in Lima.
* * * On June 18 * * * the undersigned met in ICA offices with Messrs. Patterson and Bryant, DUSOM and Deputy DUSOM respectively. Mr. Patterson gave a general resume of the activities of CAA persomiel about which he was complaining. He stated that Lawrence Clark, Electronics Engineer, had met with much difficulty in negotiations with three separate landlords, a furniture dealer, and in the sale of an imported automobile contrary to Embassy regulations. Pie further stated that George Clark. Chief of CAA Mission, has been doing what is called “free wheeling”, that is, Clark was operating or attempting to operate irrespective of ICA headquarters in some cases. Also, that he had information that George Clark was using the Government cars contrary to current regulations. * * *
* * * On June 20 * * * the undersigned met with Mr. Gannon and briefed him in regard to the Washington meeting of June 14 and presented him with a copy *531 of TOICA No. 280. A plan of action was discussed in which he suggested that we work together through the investigation. This was done.
After this * * * meeting * * * we talked with Messrs Patterson and Bryant again in order to obtain what Mr. Gannon called a “Bill of Indictment”. This was given in more or less general terms and the investigation began.
In the case of Lawrence Clark, it was brought out by his own admission that he was involved in the purchase and importation of a new Desoto automobile and after signing an agreement in the U.S. Embassy not to dispose of the automobile for two years, made a deal to sell the auto to one Senior [sic] De Polio, Chilean importer. He turned the car over to De Pollo and retained the registration and license plates in the name of Lawrence Clark until the two year period was to expire. _ At no time did Lawrence Clark put up any money in this transaction. He signed a statement in regard to the points mentioned above.
In addition to the car deal, he was involved in various squabbles with landlords, servants, and a furniture dealer in which law suits and local police were involved. A detailed report of these items are to be included in Mr. Gannon’s report.
In the case of George Clark it was brought out that:
1. He had full knowledge of the foregoing but had failed to keep the DUSOM properly apprised.
2. He had approved state side leave for Mr. Frank Finnan, ATC Specialist, without coordinating with ICA headquarters.
3. A Senior [sic] Cruz contacted the Chilean Foreign Office in an effort to obtain permission for George Clark to import a second automobile since his original imported car had been damaged in a wreck. In regard to this item Clark stated that he had not intended for Mr. Cruz to contact the Foreign Office in his behalf but he did ask him to check on the point of law involved. The Foreign Office contacted the Embassy about this matter, which resulted in embarrassment to officials of the U.S. Embassy because of the unorthodox procedure that was followed.
On June 21 the information obtained was presented to Mr. Patterson. * * * Mr. Patterson * * * stated that he would recommend the recall of Lawrence Clark with the provision that he be allowed sufficient time to “clean up” the automobile deal and several accounts to local people. The undersigned concurred in this recommendation.
*532 Mr. Patterson stated that be would withhold a decision in the case of George Clark until the following morning. The undersigned and Mr. Gannon again met with Lawrence Clark the following morning, who signed a prepared statement in regard to the automobile deal. He was told at that time that he would be recalled and that he would be given thirty days in which to take care of his personal affairs. The undersigned stated to him that as far as the CAA is concerned that there is no complaint against his technical performance and that it may be possible for him to return to Federal Airways Washington for employment.
During the discussion with Lawrence Clark, Mr. Patterson called and stated he would not be able to be at the office that day, but that in regard to George Clark, if nothing else significant is uncovered by Mr. Gannon before he leaves Chile he (Mr. Patterson) would not ask for the recall of George Clark at this time. He stated that he had high regard for the work done by CAA in the two years the program has been established in Chile, but he feels that George Clark has not been completely responsive and loyal in his dealings with Mm as DUSOM. However, he stated that he will reserve final decision for between now and when he takes home leave in December. If George Clark shows beyond a doubt that he intends to cooperate in an acceptable manner, he in all probability will remain in Chile. He also stated he would ask Mr. Gannon to check into Clark’s use of government automobiles because it had been reported he was using them for personal reasons. The undersigned concurred hi this decision.
iji ❖ ❖ % ❖
28. Following is the text of the ICA investigator’s final report, prepared in Lima, Peru, on July 24, 1956, and forwarded to ICA and CAA, Washington:
George Clark, Party Chief, CAA, USOM/Chile, charged with administering project without regard to regulations of USOM/Chile and in violation of agreement between Department of Commerce and FOA. Subject’s unorthodox attempt to import a second personal car duty free embarrassed American Embassy in its relation with Chilean Foreign Office. Subject alleged to have monopolized official transportation even to extent of leaving official vehicle with his family at summer resort, Viña del Mar, for five to six weeks while subject was absent on official business at Easter Island. Lack of guidance of subordinate, Lawrence Clark, al *533 leged to have resulted in latter’s violation of Embassy car import regulations and involvement in legal entanglement. Embassy also concerned over official purchase of radio transmitter without prior authorization of Embassy or USOM/Chile. Subject permitted subordinate employee F. S. Finnan to go to the United States without advice to or authorization from USOM/ Chile. Subject has officially purchased items in home for personal use. Eecord reflects official property known to be in home of the subject valued at $3,671.78, out of total inventory of $8,171.33.
DETAILS

At Santiago, Chile

Mission Director Patterson and Deputy Director Bryant advised the writer on June 19,1956, that USOM/ Chile had experienced administrative difficulties with CAA/Santiago because of the “free wheeling” administration of CAA Party Chief George Clark. Mr. Patterson stated that he wanted a development of the full facts, and that for this reason Mr. Edward Warner, of CAA./Washington, and the writer had been requested to cometo Santiago.
Mr. Edward Warner and the writer interviewed the subject, George Clark, and Lawrence E. Clark at various times between June 18 and 22, 1956. Mr. Warner returned to Washington on the last mentioned date.
Points of Disagreement on Administrative Matters:
The phases of administration discussed in these joint interviews were as follows:
1) Teclmioal Matters:
The CAA Field Eepresentative is authorized to report direct to Washington on technical matters and is only required to advise USOM/Chile. It was agreed that the instructions pertaining to this are sufficiently clear, but as interpreted and carried out by George Clark, the timing was bad; the advising of the Mission should be closer to the time Party Chief Clark reported to CAA/W.
2) Requesting Additional Teclmioal Personnel for CAA/Chile:
Additional technical personnel needed by CAA/Santiago, Chile, should be requested through the Eegional CAA office in Panama. Mission Director Patterson and CAA Party Chief Clark differed in their interpretations of this point. However, it was agreed that this ruling must be invoked only after prior clearance with USOM/ Chile, since it is necessary for USOM/Chile to clear any *534 named technician with the Chilean authorities in order to ascertain that the individual technician is acceptable for entry into Chile.
3) CAA/Chile Personnel Administrative Matters:
Matters pertaining to the administration of CAA/ Chile, such as travel and personal conduct, should be under the direction of USOM/Chile. With regard to this regulation, CAA Party Chief Clark had the impression that personnel matters within CAA/Chile were under his control and jurisdiction and that he should be free to handle them as he saw fit. Mr. Clark cited the memorandum of agreement between the Department of Commerce and FQA/Washington, page 3, Section 2, Overseas Section B, Communications, which in part reads as follows:
“Department personnel may send official communications directly to the Department on technical operating and personnel matters pertaining to the project.”
Mr. Clark quoted the above portion of the regulations but did not include the next sentence, which reads as follows:
“Copies of all such communications will be provided the UoOM at the same time.”
Mr. Clark admitted that he had not complied with the latter portion of the regulation, in that he had not been providing USOM/Chile with copies of his communications “at the same time.”
It was explained to Mr. Clark that any change in personnel of CAA/Chile must be effected only with the concurrence of the Director of USOM/Chile, since it is the latter’s responsibility to maintain a good general relationship with the Chilean authorities, which includes receiving their permission to add or remove a technician in any field.
After a full discussion of these administrative points with Mr. Clark by Mr. Edward Warner and the writer, it is believed that Mr. Clark now has a proper concept of these regulations.
Attempt to Import Second Personal Car Duty-Free:
There was an allegation to the effect that George Clark caused an individual named Cruz to contact the Chilean Foreign Office with regard to the possibility of importing a second car duty free, basing his request on the claim that his first car was no longer serviceable due to having been wrecked in an automobile accident. This allegation also reflected that the inquiry made of the Foreign Office on Clark’s behalf was relayed by the Foreign Office to the proper American Embassy officials, *535 who were embarrassed by this unorthodox attempt to import a second automobile duty free.
When questioned about this, Mr. Clark said that he had been approached by Julio Cruz, a Chilean associate, who advised him that it would be possible to import another car duty free since his original car had been wrecked. Mr. Clark further stated that he had requested Mr. Cruz to look into this matter, not knowing that Cruz would make a contact with the Foreign Office. This statement was made by Mr. Clark in the presence of Mr. Warner and the writer.
Subsequently, on June 28, Deputy Chief of Mission William Sanders of the American Embassy, Santiago, Chile, was interviewed by E. C. Bryant, Deputy Director, USOM/Chile, and the writer, concerning the complaint alleged to have been made by the Foreign Office with regard to George Clark’s attempt to import a second automobile duty free.
Mr. Sanders stated that he had no first-hand knowledge of this complaint but that it had been relayed to him by Miss Malena Saavedra, a Chilean employee of the American Embassy, who handles all phases of duty-free importation of autos by American Government employees in Santiago.
On June 28, 1956, Miss Malena Saavedra was interviewed by Deputy Director E. C. Bryant and the writer. She stated that George Clark had contacted her personally, asking about the possibility of importing a second automobile duty free, claiming that his car had been wrecked in an accident.
Miss Saavedra stated that she has been employed by the American Embassy for fifteen years and that one of her duties is to arrange for the duty-free importation of automobiles for American Government personnel. She said that when Mr. Clark contacted her and offered to provide invoices reflecting that his automobile had been rendered completely inserviceable, she instructed him not to take any action in the procurement of a permit for another car. Miss Saavedra said further that she told George Clark she would make an informal verbal inquiry at the Foreign Office to determine the reaction of the Chilean authorities to such a request.
Miss Saavedra said that she did make such verbal inquiry and determined that the answer was in the negative. She said that she so advised Mr. Clark.
During the time Mr. Clark was interested in the permit for a second car, Miss Saavedra said that Julio Cruz had come in to see her on several occasions. She said *536 that she had had no reason to doubt that Mr. Clark and Julio Cruz would abide 'by her information that the importation of a second automobile on a duty-free basis was impossible. She said that she was therefore very much surprised when she received a telephone call from the Foreign Office asking whether she was still handling car importation permits for Point 4. Miss Saavedra stated that she advised this individual in the Foreign Office that she still handled this detail. The person calling then advised her that an individual (presumably Julio Cruz) had appeared at the Foreign Office with a letter requesting permission for George Clark to import a second car duty free, together with invoices purporting to show that his first car had been wrecked. Miss Saavedra stated that this Foreign Office person then advised her that he had refused to accept the letter and invoice tendered by the individual on behalf of George Clark. Miss Saave-dra said that this was fortunate, for the acceptance of the letter and invoices on behalf of George Clark would have gone on the record of the Foreign Office and might have proved detrimental to the interests of other American Government employees in Chile. Miss Saavedra said that when she received this information from the Foreign Office, she advised her superior, Mr. Sanders.
During the course of the interviews of George Clark by Ed Warner and the writer, it had been pointed out to Clark that applications for importation of automobiles duty free by USOM personnel are handled through regular staff channels of USOM/Chile, who in turn are charged with contacting Miss Malena Saavedra of the American Embassy.
The writer re-interviewed George Clark on June 28 on this particular subject and asked him which contact was made first: the one with Miss Saavedra of the American Embassy, or Mr. Cruz’s contact with the Chilean Foreign Office. Mr. Clark stated that his contact with Miss Saavedra followed Cruz’s contact with the Foreign Office. It will be noted that this disagrees with the statement made by Miss Saavedra.
Misuse of Official Automotive Transportation:
Deputy Director E. C. Bryant advised that a suburban carry-all assigned to the Health Division of USOM/Chile was loaned to George Clark upon his arrival at the Mission for use on CAA project business. This automobile, assigned to the Health Division and loaned temporarily to the subject, was not returned by him. Instead, the vehicle was loaned by the subject to the Chief of the Santiago Airport, National Ministry of *537 Defense, Aeronautics Division, Civil Aeronautics Mission. This vehicle was thus loaned by the subject without consulting with or receiving any authorization from USOM/Chile. A translation of the letter directed to the Aeronautics Division of the Ministry of Defense, concerning this vehicle, signed by George Clark, follows:
I have the pleasure of acknowledging receipt of your communication No. 120, dated April 4, 1956, in regard to the Chevrolet vehicle which the Mission might furnish for transportation to and from the Airport for Control Tower personnel and meteorologists, as well as for persons attending the courses given by the Mission’s Consultant in Airways Operations.
The undersigned has issued instructions to Mr. Finnan to the effect that this vehicle may be used in any way related to the transportation mentioned above, and also in any other manner connected with the airport, when it is not being used in transporting personnel from and to their place of work, always providing that such use is for official matters having to do with airport operations.
However, we were unable to supply chauffeur, fuel, oil and maintenance of the vehicle, since this vehicle is not actually property of the Mission but belongs to the Embassy of the United States and is on loan to this Mission, assigned to Mr. Finnan at the Airport until such time as the Embassy requests its return.
It might be noted in the last paragraph of this letter that mention is made that the car is the property of the Embassy of the United States. No reference is made to USOM.
In addition to the above-mentioned vehicle on loan, USOM/Chile purchased two vehicles at the request of George S. Clark for the use of CAA. One suburban carry-all, purchased in April, 1955, was requested by Mr. Clark and approved in the budget, and the PIO (Purchase Implement Order) signed by Acting Director Hamill, USOM/Chile. A second suburban carry-all was purchased in November, 1955, at the request of Mr. Clark, the PIO being signed by Mr. Clark, Faustin A. Guerin, and E. C. Bryant.
The loan of the carry-all to the Chilean Ministry of Defense was explained by Mr. Clark as being a necessary step to aid the students working in the Santiago Airport tower under the instructions of CAA Technician Francis X. Finnan. Both Mr. Clark and Mr. Finnan *538 took tbe position that it was necessary to provide transportation to these students because of the hardship caused by the lack of public transportation facilities in Santiago. It was pointed out to both Mr. Clark and Mr. Finnan that the loan of this vehicle in a measure constituted economic aid and could not rightfully be construed as technical aid within the scope of the functional organization of CAA.
Mr. Finnan stated that he uses his personal automobile in connection with his work, with free gas being supplied by the Aeronautics Division of the Chilean Government. He stated that even if offered the carry-all currently loaned to the Airport Tower personnel, he would have to refuse it because he could not be placed in the position of depriving his students of transportation which they are currently enjoying. He said that under the circumstances he would continue to use his personal auto.
The subject monopolizes the cars assigned to his section by USOM/Chile, according to the statement of Deputy Director E. C. Bryant. Mr. Bryant stated that rigid control is maintained over official USOM vehicles, with the exception of those assigned to the CAA. Mr. Bryant stated that he does not mow of anyone else who assumes complete control over official vehicles in the manner exercised by George Clark to the exclusion of other members of his staff.
It might be noted that the writer personally observed the two carry-alls which had been specifically purchased for the use of CAA, parked at the residence of Mr. George Clark at 8 p.m. on the night of June 26, 1956. On June 28, Mr. Clark was advised that the writer had made this observation. Mr. Clark stated that one car, located inside his fence, was awaiting license plates.
In connection with the license plates it should be noted that Julio Navarrete, administrative assistant to George Clark, had advised the writer on June 25 that George Clark had attempted to obtain a Chilean Air Force license plate for one of these carry-alls, which had arrived in Chile on May 25,1956. Mr. Navarrete stated that the Air Force agreed to obtain the license plates but mentioned that the municipality of Santiago insisted on being paid for them. While the Air Force promised to deliver the tags, they were not forthcoming. As a result, George Clark instructed Mr. Navarrete to obtain the form used for applying for USOM license plates, together with a USOM letterhead, and thereafter Mr. Navarrete prepared the regular application letter for *539 receiving license plates through USOM/Chile and submitted it through proper channels. Mr. Navarrete stated that this letter was prepared under Mr. Clark’s instructions in order to avoid any further delay which might have been occasioned by USOM’s routine handling of the application. Mr. Navarrete stated that when he applied for the license by delivering the letter to USOM, he was questioned as to why the application had not been submitted earlier so that the license would have been ready upon the arrival of the carry-all in Chile. Mr. Navarrete stated that it was Mr. Clark’s desire to prevent any further delay in obtaining the license, after the long delay occasioned by his attempt to get an Air Force license, that had prompted the preparation of the application letter for signature by a USOM official.
It might be noted that the vehicle without a license arrived on May 25, and as of the time of the interview with Mr. Navarrete, had been tied up for more than thirty days due to the absence of license plates.
Mr. George Clark was questioned by the writer as to the physical location of the other official carry-all during his five to six week absence from the Chilean mainland while on official business at Easter Island. Mr. Clark stated that the official carry-all was left with his family at the summer resort of Vina del Mar for that period. He said that the car was stationed at his summer residence for emergency use by his family. It might be noted that at that time this vehicle represented the only possibility of official transportation for CAA technicians Lawrence Clark and Francis X. Finnan.
Remarks of Julio Navarrete, Administrative Assistant, CAA/Santiago :
Julio Navarrete, Administrative Assistant to George Clark, CAA/Chile, stated that he is the only Chilean on the payroll of USOM/Chile working within the office of George Clark. He stated that he resented the treatment afforded him by Mr. Clark. In his own words, “Mr. Clark treats me like a piece of furniture.” Mr. Navarrete said that when he entered on duty on June 6,1955, Mr. Clark had advised him that insofar as CAA was concerned, he, Clark, felt that USOM was simply the purchasing agent, and that he expected Mr. Navar-rete to take USOM’s place by handling all the purchases.
As a result of his feeling of discontent in the CAA operation, Mr. Navarrete requested a transfer to the regular USOM staff. According to Navarrete, as a result of this request made to Executive Officer Guerin, he *540 was called in by Mr. Clark and advised that things would be different. Mr. Navarrete stated, however, that there was no change.
Allegation had previously been made to the writer by Lawrence Clark that certain technical equipment ordered through official channels was diverted for the personal use of George Clark. Mr. Navarrete was questioned concerning the ultimate destination of equipment entering the office of CAA under official purchases made through the facilities of TJSOM. Mr. Navarrete stated that there were a number of technical items which came through the office and were delivered to Mr. George Clark but which thereafter disappeared from the office. He said that he could only assume that these articles were in George Clark’s home, but that he had only been in Clark’s house on one occasion and had no first-hand knowledge of the presence there of any of this official equipment.
Kemarks by Lawrence Edward Clark: (Note: Lawrence E. Clark is the subject of a separate case.)
Lawrence E. Clark, Electronics Engineer, CAA, USOM/Chile, stated that he arrived hi Chile on June 4, 1955. He said that when he left W ashington he had no intention of importing an automobile into Chile because he could not afford it. However, after he arrived in Santiago, his Chief of Party, George Clark, asked him on many occasions why he refused to bring in a car for personal use, and advised him that if he did not import a car he would be losing money. George Clark had also told him that some arrangement could be made to provide him with the money. Lawrence Clark said that in his opinion he became involved in an illegal transaction connected with his importing of a personal automobile, due to the urging of George Clark, and that he felt the “fixing” of the financial arrangement by Cyril Smith, a Chilean with whom George Clark had considerable business association as well as very friendly relations, was known to George Clark. Further, Lawrence Clark stated that at one point in the car negotiation, George Clark had come to his home and advised him to turn over the automobile involved to the Chilean named DePolo, in keeping with an agreement which Lawrence Clark had signed, in order to appease DePolo and keep this illegal transaction from becoming known to the American Embassy and USOM/Chile. Lawrence Clark stated that at this point he had suggested to George Clark that the matter be taken to the American Embassy or that it be discussed with Mission Director Patterson, but George Clark had said this should not *541 be done. (Note: For details of this illegal automobile negotiation, see case entitled Lawrence E. Clark.)
On June 25, in a discussion with the writer, Lawrence Clark stated that it was his opinion as an electronics engineer that a number of technical items were purchased through official channels which were not for use in connection with any equipment on the CAA. project. He stated that this technical equipment was being purchased for the personal use of George Clark in connection with the high fidelity equipment and radios maintained in his home.
Specific Criticisms by USOM Concerning George Clark’s Administration of CAA:
On June 28, 1956, Deputy Director E. C. Bryant of USOM/Chile enumerated the following examples which, in his opinion, revealed maladministration:
1) Mr. Bryant stated that USOM/Chile indirectly learned of George Clark’s efforts to have Lawrence Clark transferred out of USOM/Chile without prior consultation with USOM. This is set forth in enclosed Exhibit “A”, being a letter dated May 24, 1956, in Santiago, Chile, from George Clark to Evan J. Lewis, CAA, Washington, D.C. Included in this exhibit there is a memorandum of the same date written by George Clark detailing “a listing of the major actions by Larry which have had an effect upon his local relationships, his attitudes, and ability to perform his work.”
Mr. Bryant stated that the first word that USOM had of the details about the involvement of Lawrence Clark in the illegal automobile transaction was when the writer presented all the facts to Mission Director Patterson and Deputy Director Bryant. Mr. Bryant feels that if the matters had been handled within regular administrative channels, Lawrence Clark would not have been permitted to become so involved in these activities which resulted in his recall.
2) Mr. Bryant stated that the subject had alienated the only Chilean USOM employee on his payroll, Julio Navarrete.
3) The subject embarrassed the American Embassy by having Julio Cruz contact the Chilean Foreign Office in his effort to obtain permission for the duty-free entry of a second automobile.
4) Subject has disregarded the official transportation procedures prevailing within USOM/Chile by monopolizing the vehicles assigned to CAA. Mr. Bryant cited the instance of the subject giving his official car to his *542 family for use at Vina del Mar while he himself was absent from the Chilean mainland.
5) Subject attempted to have official purchases shipped through the Chilean Air Force rather than by established USOM channels which enable routine treatment for proper accounting and inventory records of materials received.
6) The subject, without authorization, loaned an official car to the Chilean Ministry of Defense. Mr. Bryant stated that it would be very difficult to reclaim the car and would place USOM in a bad light when they were forced to reclaim the car which had been loaned by George Clark.
Y) George Clark purchased and utilized a Collins radio transmitter without obtaining authorization from either the USOM or the American Embassy. In this regard Mr. George Clark advised the writer that he secured the radio in order to confer readily with other CAA representatives in Panama, Lima, and other points in South America. It might be noted that the Deputy Chief of Mission in the American Embassy in Santiago evidenced considerable concern upon learning that a radio transmitter had been imported into Chile without prior authorization from the American Embassy.
8) The subject permitted his subordinate, F. X. Fin-nan, to make a trip to Panama and the United States without notifying or receiving authorization from USOM/Chile.
9) The subject sends copies of technical reports directly to the Embassy. (When Mr. Bryant questioned this practice, subject asked, “How do I know you’ll send them to the Embassy ?”) Mr. Bryant stated that it is the position of USOM that it is perfectly all right for George Clark to send technical reports directly to CAA/Washington, with copies for USOM/Chile, but that copies to be forwarded to the Embassy should go through regular USOM channels and not be sent directly by the Party Chief.
10) Mr. Bryant stated that CAA purchase orders reflected the use of technical funds for administrative purposes. He cited the purchase of small-wattage transformers for use by George Clark in his home. Mr. Bryant explained that USOM/Chile had received authority to purchase transformers out of administrative funds and furnish them to all personnel in USOM/Chile when so requested.
11) In the mimeographed “request” form for official purchases of supplies, George Clark has consistently re *543 fused to sign in the space provided for tbe signature of the person initiating the request. Instead, he signs in a space at the bottom of the form, marked “Approved”. This requires the approving officer in USOM to initial above the signature of George Clark.
Official Government Property Maintained in Residence of Subject:
A review of the inventory file of USOM/Chile revealed that the total value of inventory charged against CAA is $8,111.33 — not including official vehicles — and of this amount, $3,671.78 worth is located in the home of the subject.
Allegation of Political Activity in Peru:
Lawrence Clark indicated to the writer that he had information to the effect that George Clark was involved in some manner in the internal politics of Peru during the time he was stationed in Lima.
Conference with Mission Director Patterson:
Deputy Director E. C. Bryant of USOM/Chile and the writer conferred with Mission Director Albion Patterson on June 29, 1956, at the latter’s home. All the facts in this report were discussed. As a result of this conference Mr. Patterson stated that he wanted George S. Clark, CAA Party Chief, recalled. Mr. Patterson stated that he would like the order recalling the subject to be so timed that his replacement would arrive prior to the notification of recall to Clark, in order, to avoid any possible damage to USOM as a result of an interim period. Mr. Patterson said it would be possible for Mr. Clark to slander USOM personnel in talking to his Chilean contacts, if there were an interim period affording him such an opportunity. Mr. Patterson stated that he would like very much to have CAA/Washington name a man to replace George Clark and to assume command upon his arrival in Santiago, Chile, simultaneously with the notice to George Clark of his recall.

At Lima, Peru:

Summary of the facts contained in this report were relayed by telephone to Thomas E. Naughten, Director, Personnel Security and Integrity, ICA/Washington, by the writer, on July 2,1956.
Inquiries are currently being made through American Embassy sources to determine if there is any record of the subject’s being involved in internal Peruvian politics during the time he was stationed at Lima, Peru.[16]
*544 CONCLUSION 03? LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Rule 38(c).

 International Cooperation Administration. It was tie successor of Foreign Operations Administration (FOA). The United States Operations Mission (USOM) was a branch of FOA and ICA. They, in turn, were branches of the Department of State.

 No performance ratings for years subsequent to 1954 are in evidence.

 During Ms tour of duty in Santiago, plaintiif’s relationsMps -with CMlean officials and citizens were enhanced (1) by his facile command of the Spanish language, (2) by his knowledge of the customs of the people, and (3) by unofficial fraternization at social functions.

 The CAA was a constituent agency of the Department of Commerce.

 The name of the Foreign Operations Administration was later changed to the International Cooperation Administration (sometimes hereinafter ICA).

 In a report on plaintiff prepared in December 1964, one oí Ms administrative superiors noted (1) that plaintiff worked better with “those with subservient attitudes”; (2) that he was “somewhat difficult” in approachability;
(3) that he enjoyed the confidence of his superiors “not entirely” and of his subordinates “not too much”; (4) that his “lack of communication does not make people feel that they ‘belong’ ”; and (5) that he “tends to be arbitrary and supercilious — talks ‘down the nose’ even to superiors.” Other evidence in the record tends to confirm the existence of unfortunate personality traits which impeded plaintiff’s relationships with his associates.

 As used in the testimony, “free-lancer” and “free-lancing” imply a tendency to disregard channels. The term “free-wheeling” is sometimes used in the testimony to denote the same tendency.

 Any American car brought a premium of $4,000 to $6,000. A new Chevrolet would bring $14,000.

 This phrase. “Civil Aviation Party,” was used in both F0A and CAA to distinguish the Civil Aviation Mission from the US0M, of which Civil Aviation was a part.

 The letter of charges against plaintiff was dated Octobeg 5, 1956. While the eases were processed separately, the processing occurred simultaneously under the supervision of the Personnel Officer. Mr. Lawrence Clark was reprimanded and demoted. He was not discharged.

 The Clark automobile transaction was not made part of tlie formal charges against plaintiff.

 The name of the Foreign Operations Administration had been changed to International Cooperation Administration.

 Home leave was due at the end of 2 years. Plaintiff completed 2 years In Santiago in June 19.56, but ashed and was granted permission to defer it until December, which marked the end of the school year, the seasons being reversed in the Southern Hemisphere.

 His official title was Latin-Ameriea Area Supervisor.

 This was the position plaintiff left to undertake the mission to Chile in an excepted position under Schedule A. If he had completed his assignment satisfactorily, he would have been entitled to restoration to the classified service in the same or a similar position. Restoration to the same position would have meant the transfer of the incumbent or his release through a reduction in force.

 In May 1956, after the expiration of 2 years, permission was granted to plaintiff by USOM to import a second personal car. Before he acted on the permission, the difficulties recited in this report had beset him, and he never took advantage of it.

 Here is no further evidence on this point.